Honorable Mac D. HUNTER, Plaintiff,

v.

SUPREME COURT OF NEW JERSEY, et al., Defendants.

Civ. No. 96–848 (WGB).

United States District Court, D. New Jersey.

Aug. 27, 1996.

Alicia D. Bass by Alicia D. Bass, Suzanne Halie, Cherise D. Kimball, Renee Lenzy, Jersey City, NJ, for Plaintiff.

Peter Verniero, Attorney General of New Jersey by Jeffrey J. Miller, Asst. Atty. Gen., Matthew R. Gabrielson, Don E. Catinello, Dist. Atty's. Gen., Trenton, NJ, for Defendants.

*OPINION*

BASSLER, District Judge:

This case arises out of the Supreme Court of New Jersey's July 6, 1995 private reprimand of Judge Mac D. Hunter of the Superior Court of New Jersey. The Supreme Court reprimanded the Judge for his refusal to cooperate with the Advisory Committee on Judicial Conduct in its investigation of a complaint against him. The Supreme Court dismissed the underlying complaint which alleged that the judge had abrogated his duties by refusing to extend the court session beyond 4:00 in order to allow a witness with special medical needs to complete her testimony. The Court noted, however, that the

judge's refusal to allow the testimony to continue was "an abuse of discretion that borders on judicial misconduct."

On February 26, 1996 Judge Hunter filed a three count complaint in the United States District Court naming as defendants the Supreme Court of New Jersey, Honorable Robert N. Wilentz [1], former Chief Justice of the Supreme Court of New Jersey, The Advisory Committee on Judicial Conduct ("ACJC"), and Honorable Sidney M. Schreiber, Chairperson of the ACJC. The Complaint alleges that the defendants violated Judge Hunter's civil rights under 42 U.S.C. § 1983. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3).

The First Count contends that the defendants violated Judge Hunter's rights under the First, Sixth, and Fourteenth Amendments to the United States Constitution. In this Count, Judge Hunter asks this Court to vacate and rescind the letter of private reprimand, strike the decision, and permanently enjoin the defendants from implementing the disciplinary rules to discipline plaintiff.

Count Two asserts that the New Jersey court rules that establish the procedure for discipline of judges, Rules 2:15–1 et seq., are unconstitutional. Judge Hunter contends that the Rules violate the Due Process and Equal Protection clauses of the Fourteenth Amendment of the United States Constitution. At oral argument, however, counsel for Judge Hunter withdrew the equal protection challenge. Count Two requests declaratory and injunctive relief prohibiting the defendants from applying the rules to future complaints against judges in the absence of certain due process protections.

Count Three contends that the private reprimand violated the disciplinary rules because the rules did not obligate Judge Hunter to make a statement to the Committee. Count Three also contends that the discipline imposed for his conduct towards the Committee was a violation of his First Amendment rights because it was based on statements he made to the Committee. In addition, Count Three alleges that "the Chief Justice and the

Supreme Court of New Jersey knowingly acted unconstitutionally, with vindictive motives, in bad faith, with the purpose to harass him, and created institutional bias when they had predetermined to unconditionally preclude and refuse plaintiff's timely request for a post-deprivation review hearing, the right to submit legal briefs on his constitutional claims, and oral argument," thereby depriving plaintiff of his First and Fourteenth Amendment rights.

The defendants move to dismiss all counts. They assert that the *Rooker–Feldman* doctrine and the Eleventh Amendment preclude this Court from exercising jurisdiction. Furthermore, they argue that absolute judicial immunity bars plaintiff's claims, and that the Complaint fails to state a cause of action for which relief can be granted. For the following reasons, the defendants' motion to dismiss is GRANTED.

## I. BACKGROUND

The following recitation of facts is based on documents that Judge Hunter appended to the Complaint. The documents include the entire record of the Advisory Committee on Judicial Conduct and further communications between the Supreme Court and Judge Hunter. The Court may properly consider these documents in the motion to dismiss because "the Complaint is deemed to include any written instrument attached to it as an exhibit or any statements of documents incorporated in it by reference." *Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) (citations omitted), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992). *See also Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196–97 (3d Cir.1993), *cert. denied,* 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994).

### A. The Underlying Grievance

Judge Hunter has served on the Superior Court of New Jersey since former Governor Kean appointed him in May, 1986. Former

---

1. The Chief Justice retired from his office for medical reasons on July 1, 1996 and died on July 23, 1996.

Governor Florio reappointed the Judge with tenure in May, 1993.

On September 22, 1992 Judge Hunter presided over his first civil trial in the Law Division of the Superior Court of New Jersey. At the beginning of the trial, the judge read preliminary instructions to the jury indicating that the trial would end at 4:00 each day.

At approximately 3:45 p.m., the plaintiff called its second witness, Heidi Sammarco. The witness had throat cancer and was scheduled to undergo surgery on September 24th. She was unable to speak but could communicate by writing. When the plaintiff called Ms. Sammarco, Judge Hunter reminded counsel that the proceedings would conclude at 4:00. Judge Hunter also indicated that if the defense did not have the opportunity to cross-examine the witness, he would strike her testimony.

At 4:00 p.m., counsel for the plaintiff indicated that he was on his last question and requested that Judge Hunter extend the session because the witness would be unable to return the next day. The attorney indicated that Ms. Sammarco lived in Pennsylvania, was in ill-health, and would be undergoing surgery in two days. Defense counsel agreed to extend the session and indicated that he expected his cross-examination to last no more than 10 minutes. Judge Hunter refused. Plaintiff's counsel moved for a mistrial which Judge Hunter denied.

On September 23, 1992 Heidi Sammarco's father, Jack Sammarco, sent a letter complaining about Judge Hunter's conduct to Superior Court Assignment Judge Edward Beglin. The letter alleged that Judge Hunter was insensitive to his daughter's medical condition. The letter was referred to the Advisory Committee on Judicial Conduct ("ACJC or Committee").

### B. The Advisory Committee on Judicial Conduct

The New Jersey Constitution grants the Supreme Court the authority to remove Superior Court Judges "in such manner as shall be provided by law." *N.J. Const.* Art. 6, § 6, ¶ 4 (amended 1978). The Supreme Court also has "jurisdiction over the admission to the practice of law and the discipline of persons admitted." *Id.* at Art. 6, § 2, ¶ 3.

In 1970, the New Jersey Legislature enacted the Judicial Removal Act, N.J.S.A. 2A:1B–1 et seq.[2] to "implement removal procedures as authorized generally under the Constitution." *Matter of Yaccarino,* 101 N.J. 342, 350, 502 A.2d 3 (1985). The Act leaves "much to the Supreme Court's discretion, both by implication—by failing to define proceedings in more detailed and restrictive terms—and explicitly—by providing that '[e]xcept as otherwise provided in this [act], proceedings shall be governed by the rules of the Supreme Court.'" *In re Coruzzi,* 95 N.J. 557, 570, 472 A.2d 546 (1984) (quoting N.J.S.A. 2B:2A–8), *appeal dismissed,* 469 U.S. 802, 105 S.Ct. 56, 83 L.Ed.2d 8 (1984).

"[T]he Act contemplated authority in th[e New Jersey Supreme] Court to effectuate fully the power to be exercised in this area of judicial discipline." *Yaccarino,* 101 N.J. at 350, 502 A.2d 3. In order to utilize this power, the New Jersey Supreme Court has promulgated rules regarding the discipline of judges.

New Jersey Court Rule ("Rule") 2:15–1 creates the ACJC "[i]n order to implement N.J.S. 2A:1B–10, [currently 2B:2A–10] providing for suspension prior to a hearing, and to assist otherwise in fulfilling the administrative responsibilities of the Court." Rule 2:15–1. The Committee consists of nine members. At least two of the members must be retired Justices or Judges of the New Jersey Supreme Court or Superior Court. At least three of the members are members of the Bar, and no more than four members are laypersons.

Essentially, the function of the ACJC is to investigate complaints of judicial misconduct, and either dismiss them or institute formal proceedings against the judge. After conducting a hearing, the ACJC makes a recommendation to the New Jersey Supreme Court

---

**2.** The Judicial Removal Act was "inadvertently repealed" in 1991. Assembly Judiciary, Law and Public Safety Committee Statement, Assembly, No. 38–L.1993, c. 142 (reprinted with N.J.S.A. 2B:2A–1 (West 1996)). The legislature reenacted the provisions in 1993 at N.J.S.A. 2B:2A–1 et seq.

regarding its findings and suggests appropriate disciplinary action, if necessary. The New Jersey Supreme Court then conducts its own review of the record, and makes the final decision regarding discipline.

The disciplinary procedure consists of several distinct steps. First, pursuant to Rule 2:15–8(a), the Committee must conduct a "preliminary investigation" upon receipt of a written statement or criticism or complaint, not obviously unfounded or frivolous, ... alleging facts indicating that a judge of the Superior Court ... is guilty of: (1) misconduct in office, (2) willful failure to perform judicial duties, (3) incompetence, (4) habitual intemperance, (5) engagement in partisan politics, (6) conduct prejudicial to the administration of justice that brings the judicial office in disrepute, (7) may be suffering from a mental or physical disability which is disabling to the judge and may continue to disable the judge indefinitely or permanently from the performance of judicial duties.

If the Committee decides not to proceed after the preliminary investigation, it notifies the complainant. It also notifies the judge, if the judge is aware of the complaint.

At the end of the preliminary investigation stage, the ACJC has several options. The Committee may (1) dismiss the complaint and notify the parties; (2) "if the investigation reveals some departures by the Judge from common standards of judicial propriety, such as discourtesy, rudeness, disparagement of witnesses or attorneys, and the like, or other conduct or demeanor which would reflect unfavorably upon the administration of justice if persisted in or were to become habitual or more substantial in character, the Committee may request the Judge to appear at a time and place designated for an informal discussion of the matter," after which the Committee may dismiss the Complaint; or (3) the Committee can proceed with the investigation and require the complainant to file a verified complaint if necessary. Rules 2:15–10, 2:15–11.

If the Committee proceeds with the investigation, it shall "require the complainant to file a verified complaint against the Judge," unless it is unnecessary under the circumstances. Rule 2:15–10. The Committee must "notify the Judge of the nature of the charge," the identity of the complaining party, and "the alleged facts on which the charge is based." *Id.* The Committee must also indicate that the "Judge has the opportunity to present within such reasonable time as the Committee shall fix, such matters as the Judge may choose with respect to [the complaint], including, on the Judge's request, the right to appear before the Committee, on notice to the complaining party, and to make such statement under oath as the Judge deems appropriate." Rule 2:15–10.

If the Committee concludes from the preliminary investigation "that the circumstances, if established at a plenary hearing, may call for censure, suspension, or removal of the Judge, and that formal proceedings to that end should be instituted, the Committee shall promptly file a copy of the recommendation and the record of the Committee certified as such by its Secretary with the Clerk of the Supreme Court." Rule 2:15–12. The Committee must notify the Judge. The Judge may move in writing before the Supreme Court within 15 days of receipt of the notice for an order denying the Committee's recommendation to institute formal proceedings. 2:15–13.

The Rules explicitly provide a method for handling constitutional challenges. A judge may raise constitutional challenges to the proceedings upon receiving notice under Rules 2:15–9, 2:15–10, or 2:15–11. Rule 2:15–19 provides that the challenges "shall be preserved pending Supreme Court review of the matter on the merits."

The Rules also impose a duty on judicial personnel to cooperate with the Committee. Rule 2:15–7 provides that "[O]fficials, attaches, clerks, and employees of the Courts of the State shall cooperate with and give reasonable assistance and information to the Committee and any authorized representative thereof, in connection with any investigations or proceedings within the jurisdiction of the Committee."

### C. The ACJC's Investigation of the Sammarco Complaint

On September 29, 1993, approximately one year after Mr. Sammarco wrote to Judge

Beglin regarding Judge Hunter's conduct, counsel for the ACJC, Patrick Monahan, Jr., wrote to Judge Hunter. He enclosed a copy of Mr. Sammarco's letter and asked Judge Hunter to "comment on the appropriateness of [his] refusal to permit Ms. Sammarco to complete her testimony that day in view of her illness and physical condition." This initial letter provoked an exchange of correspondence comparable to a discovery dispute before a federal magistrate.

Rather than providing an explanation of his conduct, Judge Hunter responded by letter dated October 4, 1993 "formally requesting copies of the complete file in possession of the Advisory Committee on Judicial Conduct." In response to this request, the ACJC forwarded its file to Judge Hunter on November 22, 1993.

Not content with this information, Judge Hunter wrote to the ACJC on December 3, 1993 requesting additional information from the ACJC file. He indicated that "what the [ACJC] represented as a complete file [was] noticeably lacking in certain information." At the time, Judge Hunter was aware of a letter written by Richard Krueger, the attorney who called Ms. Sammarco to testify, to Judge Beglin indicating that Mr. Sammarco's letter was "not entirely accurate." This letter was not included in the ACJC's file. Judge Hunter did have a copy of the letter which he forwarded to the ACJC.

The Judge stated that he needed the complete file in order "to review all the evidence and materials the Committee had considered and likewise to determine whether there was sufficient credible evidence which had satisfied a definitive, unbiased standard, and based thereon whether the Committee had justifiably warranted a preliminary investigation."

Responding to this letter on December 8, 1993, Mr. Monahan informed Judge Hunter that the ACJC had already provided him with all of the information received in the preliminary investigation. He noted that the Committee did not provide Judge Hunter with "copies of internal memoranda or working documents, correspondence to the complainant or to others to obtain information." Mr. Monahan acknowledged that the Com-

mittee did not previously have the Krueger letter and indicated that he would place it in the Committee's file.

Mr. Monahan's letter also stated that "[t]he Committee is disturbed by the confrontational tone of your letter of December 3, especially in view of Rule 1:18 and the duty of cooperation set forth in Rule 2:15-7. The letter was not responsive to the Committee's request for your comments, as conveyed by my letter of September 29, 1993, and the committee would appreciate your response."

Rather than provide an explanation of his conduct as again requested by Mr. Monahan, Judge Hunter on December 16, 1993 responded that he was entitled to discovery and indicated that if the Committee acted without providing him with discovery, it would constitute a violation of his federal and state constitutional rights and a violation of 42 U.S.C. § 1983.

On January 14, 1994 counsel for the Committee wrote to Judge Hunter again advising him that he had already received everything in the Committee's file. The letter also indicated that the ACJC sought Judge Hunter's comments as part of its preliminary investigation and that he could appear before the Committee to present an informal statement on February 9, 1994 if he wished to do so. The letter asked Judge Hunter to submit his written comments and to inform the Committee whether he would appear by February 4, 1994.

Judge Hunter responded on January 31, 1994 that "[t]he Committee's refusal to honor my demand for discovery is highly prejudicial and prohibits my written comments and appearance." Judge Hunter then stated that "Mr. Sammarco's complaint is completely orchestrated and groundless." He concluded with the following statement:

> I have a clear, distinct and personal appreciation of that now-popularized phrase "high-tech lynching," which was coined by United States Supreme Court Justice Clarence Thomas during his Senate confirmation hearing. Law and justice in the United States have come a long way since the time when the ideology of white supremacists was manifested through the

likes of the Ku Klux Klan, which brutalized and lynched Afro–Americans. However, the question is now raised, "Just how far?" Specifically, fundamental fairness and justice is subverted when these basic virtues are submerged in an intellectual debate over rule interpretations and a rush to judgment.

The receipt of discovery prior to submitting my written comments and/or appearance would have been most revealing for all parties. I contend that discovery will disclose concealed motives, hidden agendas and personal racial bias, culminating in an abuse of high professional authority and disparate treatment. I further contend that false impressions have been made to the Committee so as to make it the legitimate vehicle to discredit me and to disenfranchise my stature.

You are hereby noticed that upon the Committee's presentation of this matter to the Supreme Court, I shall petition the Governor and Attorney General, pursuant to *N.J.S.A.* 52:17A–13, to provide the necessary appropriation to obtain private counsel.

On March 7, 1994, the Committee gave up on its efforts to have the Judge respond to the Sammarco letter and, not surprisingly, advised Judge Hunter that it would proceed with the preliminary investigation without his assistance.

On July 26, 1994, the Committee filed a two count Formal Complaint [3] against Judge Hunter. The First Count charged Judge Hunter with failing to cooperate with the Committee, specifically:

By refusing to cooperate with the Committee's valid request for his comments, Respondent violated *Rule* 1:18 which makes it the duty of every judge to abide by and to enforce the provisions of the Rules of Professional Conduct, the Code of Judicial Conduct; *Rule* 2:15–7 which requires judges to "cooperate with and give reasonable assistance and information to the Committee and any authorized representati[ve] thereof, in connection with any investigations or proceedings within the jurisdiction of the Committee;" wilfully failed to perform his judicial duties in violation of *Rule* 2:15–8(a)(2); and engaged in conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of *Rule* 2:15–8(a)(6).

The First Count also alleged that "[b]y the observations contained in his correspondence to the Committee, particularly in his letter of January 31, 1994, Respondent has manifested a lack of judgment and has provided sufficient cause to question his stability. See *Rule* 2:15–8(a)(7)."

The Second Count related to Judge Hunter's conduct towards Heidi Sammarco. The Second Count alleged that:

**3.** The Complaint is the first of several actions by the Committee that are not explicitly authorized by the rules governing judicial discipline. At oral argument, Deputy Attorney General Jeffrey Miller indicated that this Complaint was not a formal complaint pursuant to Rule 2:15–12. Instead, he suggested that the ACJC filed this Complaint pursuant to Rule 2:15–8 and 2:15–10. Although Rule 2:15–8 indicates that the Committee may make its own investigation of a judge in the absence of a complaint, it does not indicate that the Committee is empowered to file a complaint. Furthermore, Rule 2:15–10 requires the "complainant to file a verified complaint against the Judge", "unless the circumstances render it unnecessary." Rule 2:15–10 does not specifically provide for a Complaint filed by the Committee. Deputy Attorney General Miller acknowledged at oral argument that the procedure followed by the Committee is not expressly articulated in the rules.

The Committee's deviations from the rules do not form the basis for a federal constitutional claim. *See Colon–Rivera v. P.R. Dept. of Social Services,* 736 F.2d 804, 806 (1st Cir.1984) ("Merely erroneous applications of state statutes do not present a question of federal constitutional magnitude when there is an adequate state remedy."), *cert. denied,* 469 U.S. 1112, 105 S.Ct. 795, 83 L.Ed.2d 788 (1985). As discussed in Section D, the rules do not violate due process.

Furthermore, "[i]f, in order to resolve the [plaintiff's] claim, 'the district court would have to go beyond mere review of the state rule *as promulgated,* to an examination of the rule *as applied* by the state court to the particular factual circumstances of the [plaintiff's] case,' then the court lacks jurisdiction" under *Rooker–Feldman. Worldwide Church of God v. McNair,* 805 F.2d 888, 892 (9th Cir.1986) (emphasis in original) (quoting *Razatos v. Colorado Supreme Court,* 746 F.2d 1429, 1433 (10th Cir.1984), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2019, 85 L.Ed.2d 301 (1985)).

when [Judge Hunter] refused to accommodate Ms. Longcor [Sammarco] because of her special situation, Respondent demonstrated a lack of judgment; violated Canon 3 of the *Code of Judicial Conduct,* which requires that judicial duties take precedence over all other activities; violated Canon 3a(3) of the *Code of Judicial Conduct* which requires judges to be courteous to witnesses and to others with whom they deal in an official capacity; violated Canon 3a(6) of the *Code of Judicial Conduct,* which requires judges to dispose promptly of the business of the court; wilfully failed to perform his judicial duties, in violation of *Rule* 2:15–8(a)(2); and engaged in conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of *Rule* 2:15–8(a)(6).

On September 13, 1994 counsel for Judge Hunter, William M. Kuntzler, Esq., filed an "Answer and Demurrer and/or Motion to Dismiss" ("Answer"). The Answer asserted that the Judge's conduct both towards Ms. Sammarco and the Committee was appropriate. Specifically, the document stated that his "alleged refusal to cooperate with the Committee resulted from his reasonable suspicion that the commencement of an investigation against a sitting judge for such a flimsy reason as the comments set forth in Mr. Sammarco's letter . . . raise suspicions in a black person's mind that there was more to the matter than meets the eye, namely that racism on someone's part in the process may have been involved." The Answer did not contain any constitutional challenges to the proceedings.

On December 13, 1994, the Committee held a formal evidentiary hearing on the charges against Judge Hunter. Judge Hunter appeared at that hearing represented by

Mr. Kuntzler, who made a statement on the Judge's behalf. Judge Hunter chose not to make a statement himself or to call any witnesses. He did, however, make himself available for questions from the Committee. During the testimony, Judge Hunter suggested that he perceived Mr. Sammarco as a white supremacist.

On May 26, 1995, the Committee issued its Report to the Supreme Court and transferred the record to the Court. The Committee found that Judge Hunter had breached his duties with respect to both counts of the Complaint. With respect to Count One, the Committee recommended that Judge Hunter be more flexible. With respect to Count Two, the Committee was evenly divided on whether Judge Hunter should receive a private or a public reprimand for his conduct towards the Committee.[4]

On June 1, 1995, Mr. Kuntzler, acknowledging receipt of the Committee's report, wrote to the Clerk of the Supreme Court. Mr. Kuntzler argued that the proceeding must be dismissed in light of the fact that six months had elapsed since the hearing without final decision having been rendered. In the alternative, he requested the opportunity to present oral argument on the laches issue and on the merits. Other than argue that because of "the Committee's extensive and wholly unjustified delay, the proceeding should be dismissed in the interest of fundamental justice," Mr. Kuntzler did not present any constitutional issues for consideration by the Supreme Court.

The Supreme Court issued a private reprimand on July 6, 1995, in which it denied counsel's request for oral argument. The Supreme Court dismissed the First Count of the Complaint regarding the Sammarco incident but privately reprimanded Judge Hunt-

---

**4.** The Deputy Attorney General indicated at oral argument that this report was not a "Recommendation of Formal Proceedings" pursuant to Rule 2:15–12, but merely a request to have the Supreme Court decide the quantum of discipline. Like the complaint by the Committee discussed in footnote 3, this also was an ad hoc procedure. The Rules do not provide a mechanism for Supreme Court review where the Committee is unable to reach a decision.

If the Committee had made a recommendation for removal under Rule 2:15–12, the Court would

have filed a formal complaint and issued an order to show cause. *See* Rule 2:15–12, 2:15–14, 2:14–2. If the Rule 2:15–12 recommendation was for censure or suspension, the Court could issue a formal complaint under 2:14 or could issue an order to show cause. *See* Rule 2:15–14. At oral argument, the Deputy Attorney General acknowledged that although the Rules address removal, suspension, and censure, they do not specifically discuss the procedure for the less drastic sanction of a private reprimand.

er for his refusal to cooperate with the Committee and admonished him for his inconsiderate and indefensible refusal to permit Ms. Sammarco to finish her testimony. The reprimand stated in part:

The Supreme Court has *carefully reviewed the report of the Advisory Committee on Judicial Conduct and the record on which the report was based.* The Court has determined that you should be privately reprimanded for your failure to cooperate with the Committee in connection with its investigation of the complaint that arose from the case of *Brososkie v. Brokaw* and, further, that the complaint by Mr. Sammarco should be dismissed.

The *record* before the Court makes it abundantly clear that your conduct towards the Committee was disrespectful and inappropriate. From your first contact with the Committee—Mr. Monahan's letter to you of September 29, 1993—your responses ranged from refusal to cooperate to confrontation.

Your refusal to cooperate interfered with the ability of the Committee to act in the matter and rendered it most difficult for the Committee to investigate the allegations or to address the merits of the complaint. The Advisory Committee on Judicial Conduct has an important responsibility in investigating, considering and resolving claims of judicial misconduct. In performing that role, the Committee acts as an arm of the Supreme Court and assists the Court in exercising its constitutional authority.

Instead of responding promptly and substantively to the allegations made against you, you embarked on a course of resistance. Your conduct appears willful and suggests, quite strongly, either gross indifference, patent disrespect or contempt on your part for the Committee and its role in the judicial system. That conclusion is reinforced by the increasingly hostile and confrontational tone of your letters, as well as your efforts to have the Committee follow your instructions rather than the reverse.

You clearly demonstrated a total disregard for the authority of this Court and for your responsibilities as a judge. Your refusal to cooperate with the Committee and your challenge to its authority was conduct prejudicial to the administration of justice.

Refusals to cooperate with the Advisory Committee on Judicial Conduct cannot be justified on the ground that the respondent judge has, subjectively, concluded that the Committee's inquiry was unjustified or tardy, or that racial bias infected the matter in some way. *The Court is totally satisfied that the Committee and its staff acted fairly and appropriately toward you throughout its consideration of the matter.* Any grievances a respondent may have that are attributable to the filing of a complaint or directed toward the Committee itself must be handled within the procedures that assure a full and fair hearing, the opportunity to present matters in defense and mitigation, the right to create and rely on a complete record, and to secure judicial review.

With respect to the allegations that are the subject of the complaint brought against you, the Court was fully aware of the claims of mitigation. They do not, in the Court's view, excuse your conduct. The Committee's vote was 4–4, four members voting to reprimand you publicly and four voting to impose a private reprimand. The Court has chosen the latter course only because there is nothing in your prior record suggesting a pattern of misconduct of this kind or, indeed, of any kind. The Court notes, however, that you have not at any time or in any way expressed regret or remorse for your failure to cooperate.

The Court, as noted, has determined to dismiss the charge that you were guilty of judicial misconduct when you refused to keep the jury beyond 4:00 p.m. so that Ms. Sammarco could complete her testimony. The Court has done so because your actions were taken in the context of your judicial role as a manager of litigation. A trial judge's daily decisions on commencement time and termination time will ordinarily not be subject to disciplinary oversight. Actions of a judge in that role may, however, constitute judicial misconduct. Although judges have broad discretion to

manage trial proceedings, that discretion is not unfettered.

The Court has concluded that your refusal to permit Ms. Sammarco/Longcor to finish her testimony constituted an abuse of discretion that borders on judicial misconduct.... You were indifferent to the pain, anxiety, and suffering inflicted on her. All that was required of you, as requested by both counsel, was to extend the court day for ten or fifteen minutes beyond the general dismissal time of 4:00 p.m.

. . . .

The Court views the fact that this was your first jury trial as the sole mitigating factor present. It is the Court's hope that with your added experience and with a firmer understanding of your obligations as a trial judge, you will handle future situations, no matter how unusual, with an appropriate exercise of your discretion.

This letter constitutes the Court's private reprimand and the dismissal of the other charges. It is final, and requires and calls for no response. (emphasis added).

On August 11, 1995 Judge Hunter filed a motion for reconsideration and requested oral argument. In his 14 page motion, Judge Hunter *for the first time* raised numerous constitutional issues. He specifically argued that the private reprimand violated his First and Fourteenth Amendment rights. Judge Hunter argued that: (1) the private reprimand was punishment for the exercise of his First and Fourteenth Amendment rights; (2) the First Count was vague and overbroad; (3) the ACJC and Supreme Court did not provide him with proper notice of the specific allegedly uncooperative conduct; (4) the ACJC failed to comply with the disciplinary rules; (5) the ACJC acted arbitrarily and capriciously and denied Judge Hunter a fair hearing by admitting a certification of Ms. Sammarco that was taken without notice to Judge Hunter, thus violating his right to confrontation under the Sixth and Fourteenth Amendments; and (6) the Court's decision was not supported by the record.

On September 25, 1995, the Supreme Court issued an order denying Judge Hunter's motion for reconsideration and request for oral argument. Judge Hunter responded by filing this suit on February 23, 1996.

## II.  *DISCUSSION*

Federal courts, unlike state courts, are courts of limited jurisdiction, sometimes even with respect to constitutional concerns. Before this Court can address the merits of the motion, it must first determine whether it has jurisdiction to do so.

### A.  *Rooker–Feldman Doctrine*

■ The defendants' initial argument is that this Court does not have jurisdiction to review a final adjudication of the Supreme Court of New Jersey. 28 U.S.C. § 1257 provides in part that "[f]inal judgments or decrees rendered by the highest court of a State ... may be reviewed by the Supreme Court." In both *Rooker v. Fidelity Trust Co. et al,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923) and *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983), the United States Supreme Court interpreted 28 U.S.C. § 1257 to bar direct review of state supreme court decisions in any federal court except the United States Supreme Court. Pursuant to the doctrine, "federal district courts lack subject matter jurisdiction to review final adjudications of a state's highest court or to evaluate constitutional claims that are 'inextricably intertwined with the state court's [decision] in a judicial proceeding.'" *Blake v. Papadakos,* 953 F.2d 68, 71 (3d Cir.1992) quoting *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 483 n. 16, 103 S.Ct. 1303, 1315 n. 16, 75 L.Ed.2d 206 (1983). Consequently, "a plaintiff may not seek a reversal of a state court judgment simply by casting his complaint in the form of a civil rights action." *Hagerty v. Succession of Clement,* 749 F.2d 217, 220 (5th Cir. 1984), *cert. denied,* 474 U.S. 968, 106 S.Ct. 333, 88 L.Ed.2d 317 (1985).[5]

---

**5.** "The habeas corpus jurisdiction of the lower federal courts is a constitutionally authorized

exception to the principle of *Rooker–Feldman.*" *Blake,* 953 F.2d at 71.

Although the doctrine bars constitutional challenges that are inextricably intertwined with a judicial decision, it does not bar general constitutional challenges that are independent of a judicial decision. The Supreme Court has specifically recognized that

[c]hallenges to the constitutionality of state bar rules ... do not necessarily require a United States district court to review a final state-court judgment in a judicial proceeding. Instead, the district court may simply be asked to assess the validity of a rule promulgated in a nonjudicial proceeding.... United States district courts, therefore, have subject-matter jurisdiction over state bar rules, promulgated by state courts in non-judicial proceedings, which do not require review of a final state court judgment in a particular case. They do not have jurisdiction, however, over challenges to state-court decisions in particular cases arising out of judicial proceedings, even if those challenges allege that the state court action was unconstitutional.

*Feldman,* 460 U.S. at 486, 103 S.Ct. at 1316.

Thus, in order to determine whether the *Rooker–Feldman* doctrine bars Judge Hunter's claims, the Court must evaluate whether the actions of the Supreme Court in issuing the private reprimand and denying the motion for reconsideration were judicial. The court must also consider whether any of Judge Hunter's claims are general challenges to the constitutionality of the disciplinary rules.

### 1. *Nature of Supreme Court Action*

The first issue is whether the action taken by the New Jersey Supreme Court in issuing a private reprimand to Judge Hunter was adjudicative or administrative. The "nature of a proceeding 'depends not upon the character of the body but upon the character of the proceedings.'" *Id.* quoting *Prentis,* 211 U.S. at 226, 29 S.Ct. at 69. "The form of the proceeding is not significant. It is the nature and effect which is controlling." *Feldman,* 460 U.S. at 482, 103 S.Ct. at 1314 (quoting *In re Summers,* 325 U.S. 561, 65

S.Ct. 1307, 89 L.Ed. 1795, *cert. denied,* 326 U.S. 807, 66 S.Ct. 94, 90 L.Ed. 491 (1945)).

The United States Supreme Court has distinguished adjudicative and administrative functions in the following manner:

A judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation on the other hand looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of the subject of its power.

*Feldman,* 460 U.S. at 477, 103 S.Ct. at 1312 quoting *Prentis v. Atlantic Coast Line Co.,* 211 U.S. 210, 226, 29 S.Ct. 67, 69, 53 L.Ed. 150 (1908). In *Feldman,* the Supreme Court also recognized, but did not define, the category of ministerial acts. The Third Circuit, however, defines ministerial acts as "acts taken with respect to particular individuals based on the preferences of the actor; they do not involve application of preferences inscribed in existing law; nor do they involve the creation of a rule that will apply in the future." *Guarino v. Larsen,* 11 F.3d 1151, 1157 (3d Cir.1993).

In *Feldman,* the United States Supreme Court classified as adjudicative the decision of the District of Columbia Court of Appeals [6] not to waive a bar admission rule which required applicants to graduate from an ABA approved law school. The case resolved appeals from two applicants, Feldman and Hickey, who had not attended ABA approved schools.

Both Feldman and Hickey petitioned the Court for waiver of the rule. Feldman initially argued that based on his unique situation, the rule should not be applied to him. In a subsequent letter to the Court, his attorney suggested that the rule itself was unconstitutional. Hickey petitioned the Court solely regarding his personal circumstances, rather than raising a constitutional challenge. The District of Columbia Court of Appeals denied both petitions *without oral*

---

**6.** The District of Columbia Court of Appeals is considered the "highest court of a State" under

12 U.S.C. § 1257.

*argument and without a detailed explanation of its reasons.*

In determining that the decision of the District of Columbia Court of Appeals in denying Feldman's petition was adjudicative, the Court concluded that:

> When it issued a per curiam order denying Feldman's petition, it determined as a legal matter that Feldman was not entitled to be admitted to the bar without examination or to sit for the bar examination. The court had adjudicated Feldman's "claim of a present right to admission to the bar" ... and rejected it. This is the essence of a judicial proceeding.

*Id.* at 480–81, 103 S.Ct. at 1314.

The Court also held that the decision to deny Hickey's petition was adjudicative despite the fact that "Hickey did not cite case authority in support of his arguments or make any explicitly legal contentions." *Id.* at 481, 103 S.Ct. at 1314. The Court reasoned that the District of Columbia Court of Appeals in reaching its decision had evaluated Hickey's background, the purposes of the rule, and equitable considerations for granting a waiver, which were essentially judicial inquiries. *Id.*

Like the decisions at issue in *Feldman*, the decisions of the New Jersey Supreme Court were adjudicative. The decision to issue a private reprimand clearly reflects that the Court reviewed the report of the ACJC which, after a hearing, evaluated Judge Hunter's conduct in light of specifically identified canons of judicial conduct and Rule 2:15–8(a)(2) and Rule 2:15–8(a)(6). The decision also recites that the Supreme Court reviewed the record on which the report was based. The decision of the Court is not cursory; it is set forth in a four page single spaced letter independently evaluating Judge Hunter's conduct. The Supreme Court didn't merely parrot the ACJC's suggestions, but independently analyzed the record before it and reached different conclusions. The application of existing rules to the facts is the primary characteristic of adjudication. *See Guarino,* 11 F.3d at 1159 ("In all of the Supreme Court cases finding a proceeding to be adjudicative, the proceeding involved the application of existing rules.")

Judge Hunter complains that somehow the Court acted unconstitutionally because it dismissed the charge for judicial misconduct with respect to the Sammarco complaint but then went on to issue a private reprimand. It is true that the Supreme Court did rebuke Judge Hunter for "an abuse of discretion that borders on judicial misconduct." However, the procedure followed in issuing the private reprimand met all of the due process requirements discussed in detail in Section D of this opinion. Since the Supreme Court has the authority to "censure, suspend, or remove" pursuant to Rule 2:15–12, this Court is at a loss to understand why the Supreme Court doesn't have the power to impose a lesser sanction. In any event, the decision to issue a private reprimand was an adjudicative one under the *Rooker–Feldman* doctrine.

The Supreme Court's decision to deny Judge Hunter's motion for reconsideration was also clearly adjudicative. The Court's order denying the motion implicitly rejected the arguments made in Judge Hunter's fourteen page motion, including his constitutional challenges.

Numerous other courts have applied *Rooker–Feldman* to bar review of disciplinary proceedings. *See, e.g., Stern v. Nix,* 840 F.2d 208 (3d Cir.1988), *cert. denied,* 488 U.S. 826, 109 S.Ct. 77, 102 L.Ed.2d 53 (1988); *Cohran v. State Bar of Georgia,* 790 F.Supp. 1568 (N.D.Ga.1992); *see also Middlesex Cty. Ethics Comm. v. Garden State Bar Assn.,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) (attorney disciplinary proceedings are adjudicative for purposes of *Younger* abstention); *Coruzzi v. State of New Jersey,* 705 F.2d 688, 689 (3d Cir.1983) (judicial removal proceedings are adjudicative for purposes of *Younger* abstention). Consequently, this Court is barred by the *Rooker–Feldman* doctrine from reviewing these decisions of the New Jersey Supreme Court.

Judge Hunter seeks to avoid this result by arguing that the Supreme Court's acts in issuing the private reprimand and subsequently denying his request for reconsideration are administrative. He emphasizes that the Supreme Court did not hear oral argu-

ment, hold a hearing, or provide legal analysis for its decision. Furthermore, he points out that both the reprimand and the order denying reconsideration were signed by the Clerk of the Court, rather than a Judge.

Judge Hunter primarily relies on two cases in support of his argument that the Supreme Court's actions are administrative, *Blake v. Papadakos*, 953 F.2d 68 (3d Cir.1992) and *Guarino v. Larsen*, 11 F.3d 1151 (3d Cir. 1993). In *Blake*, the Third Circuit determined that an order of the Pennsylvania Supreme Court assigning two judges to oversee administrative and budgetary matters of the Court was administrative. However, the Third Circuit concluded that review of the order was barred by the *Rooker–Feldman* doctrine, because after the President Judge of the Philadelphia Court of Common Pleas filed a Petition with the Pennsylvania Supreme Court challenging the order, the Court issued an opinion declaring that the order did not violate federal or state law.

In *Guarino*, a senior judge objected to the decision of the Supreme Court of Pennsylvania to revoke his assignment. The judge filed a § 1983 action against the Justices of the Supreme Court of Pennsylvania and their administrator alleging that they had deprived the plaintiff of due process.

The Supreme Court of Pennsylvania issued two orders regarding the revocation. The first order summarily revoked Judge Guarino's status. In making the decision to revoke, the Court did not apply any law or gather evidence. The Third Circuit concluded that this order was administrative.

Subsequently, however, the Supreme Court of Pennsylvania scheduled an order to show cause why its decision should not stand. Judge Guarino did not attend. After the return date, the Court issued a per curiam decision which held that the revocation was in the Court's sole discretion, and thereby implicitly rejected the argument that Judge Guarino had a protected property right in his position. The Third Circuit held that this order was adjudicative.

Judge Hunter contends that both the private reprimand and order denying reconsideration are analogous to the initial administrative decisions in *Guarino* and *Blake*. The analogy to these cases is unavailing. The initial decision to revoke Judge Guarino's assignment was not based on the application of law to facts; it was an unrestricted administrative function within the discretion of the Supreme Court. Similarly, the order in *Blake* solely concerned the assignment of administrative duties. In contrast, in deciding to issue a private reprimand, the New Jersey Supreme Court considered both law and facts. The Court evaluated Judge Hunter's conduct in light of existing rules governing the judiciary. Rather than sua sponte issuing a decision, the Court resolved a controversy before it; namely, whether the judge's conduct was inappropriate. The decision to deny Judge Hunter's motion for reconsideration was also equally adjudicative as the per curiam decision to uphold the decision in *Guarino* and the Court's denial of the petition in *Blake*.

Judge Hunter also argues that the decision is administrative because he did not have the opportunity to present oral argument or briefs before the Supreme Court and the Court did not provide a detailed legal analysis for its conclusions. This type of formal judicial process, however, is not a necessary accoutrement of adjudication. *See Feldman*, 460 U.S. 462, 103 S.Ct. 1303 (adjudicative despite no oral argument or formal briefs); *Guarino*, 11 F.3d at 1159 (adjudicative even though "court did not refer to precedent and provided no detailed rationale for its conclusions").

Judge Hunter also asserts that because the Clerk of the Supreme Court signed the private reprimand and order denying reconsideration, the action is administrative. The Supreme Court of the United States expressly rejected this type of form over substance argument: The "nature and effect" of the proceeding, rather than the form, is controlling. *Feldman*, 460 U.S. at 482, 103 S.Ct. at 1314. Furthermore, the Supreme Court of the United States has recognized a letter from a court clerk as a final decision of a state court under 12 U.S.C. § 1257. *See Burns v. Ohio*, 360 U.S. 252, 79 S.Ct. 1164, 3 L.Ed.2d 1209 (1959).

As discussed above, the nature and effect of the proceeding was judicial. The reprimand itself begins with the statement: "The Supreme Court has directed me to convey its decision in the above matter." The fact that the Clerk of the Supreme Court conveyed the decision adjudicating the ethics complaint does not make the process administrative.

Judge Hunter also argues that the *Rooker–Feldman* doctrine does not apply because he did not have a "full and fair" opportunity to adjudicate his constitutional claims. He relies on a footnote in *Guarino* which indicates that *Rooker–Feldman* "only applies when litigants have had a 'full and fair opportunity' to litigate their ... claim in state court." *Guarino*, 11 F.3d at 1162 n. 8 quoting *Valenti v. Mitchell*, 962 F.2d 288, 296 (3d Cir.1992).

The Court expressly recognized in *Guarino*, however, that interpreting the doctrine to require a "full and fair" opportunity to litigate "is in substantial tension with *Feldman* in which a state court's action was held to be adjudicative even though the litigants['] only opportunity to present their claims was in their original petitions to the court." *Id.* at 1162 n. 8.

But Judge Hunter did have a "full and fair" opportunity to litigate his constitutional claims: He had an opportunity to present written comments to the ACJC, to appear before it, to make a statement, and to present witnesses. The arguments Judge Hunter presented to the ACJC became part of the record before the Supreme Court. Moreover, Judge Hunter had an opportunity to present his claims directly to the New Jersey Supreme Court in his letter requesting dismissal and his fourteen page motion for reconsideration. He certainly had a more complete opportunity to litigate than the plaintiffs in *Feldman*.

Although the litigants in *Feldman* had less opportunity to present their claims to the District of Columbia Court of Appeals than Judge Hunter, the Supreme Court concluded that the district court lacked jurisdiction. The Court therefore concludes that Judge Hunter's opportunity to litigate the constitutional issues was sufficient to invoke the bar of the *Rooker–Feldman* doctrine.[7]

*Rooker–Feldman* precludes a federal district court from evaluating constitutional claims that are "inextricably intertwined" with a state court's judicial proceeding. A claim is inextricably intertwined with a state court decision when "the federal claim succeeds only to the extent that the state court wrongly decided the issues before it." *Centifanti v. Nix*, 865 F.2d 1422, 1430 (3d Cir. 1989) quoting *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987). "Where federal relief can only be predicated upon a conviction that the state court was wrong, it is difficult to conceive the federal proceeding as, in substance, anything other than a prohibited appeal of the state court judgment." *Id.*

It is clear from both the recitation of facts and the relief sought in Counts 1 and 3 that the plaintiff is attempting to appeal the Supreme Court of New Jersey's decisions. Count 1 details the communications between the plaintiff and the ACJC. It alleges that "the Chief Justice's and the Supreme Court of New Jersey's refusal to entertain plaintiff's timely request for a post-deprivation hearing resulted in a gross miscarriage of justice, violations of his procedural due process right under the Fourteenth Amendment, and reversible error."

Count 3 alleges that the private reprimand is invalid because it violated plaintiff's First

---

7. Although the parties did not raise the issue, the court is aware of another footnote in *Guarino* questioning whether the *Rooker–Feldman* doctrine applies to "decisions by a state court with respect to the legality of the state court's own actions." *Guarino*, 11 F.3d at 1159 n. 4. The court noted that "[a]djudication may require a controversy between two parties other than the body making the administrative decision." The Court recognized, however, that in *Feldman,* the "District of Columbia Court of Appeals was act-

ing as chief administrator of the bar admission process but nonetheless held to have adjudicated the legality of decisions within the process."

Because the parties did not address the issue, the court will adopt the position taken by the *Guarino* court, and assume that the *Rooker–Feldman* doctrine applies. In addition, the court notes that the New Jersey Supreme Court adjudicated a controversy initiated by Mr. Sammarco's complaint to the Assignment Judge.

and Fourteenth Amendment rights. It also alleges that the "Chief Justice and the Supreme Court of New Jersey knowingly acted in bad faith with the purpose to harass him" by denying Judge Hunter's request for a post-deprivation hearing and seeks punitive damages. Counsel at oral argument also argued that the Supreme Court's denial of oral argument before issuing the private reprimand and its refusal to entertain oral argument on the motion for reconsideration constituted a denial of procedural due process.

In both Counts 1 and 3, Judge Hunter asks this Court to vacate and rescind the private reprimand, expunge it from the record, enjoin the defendants from disciplining plaintiff, and award attorneys' fees. Count 3 also seeks punitive damages.

Because Counts 1 and 3 ask this Court to vacate the decisions of the Supreme Court, they are barred by the *Rooker–Feldman* doctrine. Furthermore, the allegations forming the basis for the punitive damage claim in Count 3 are identical to the arguments that Judge Hunter submitted to the Supreme Court in his motion for reconsideration. *Compare* Complaint at 16–23 with Exhibit D at 5–13. The Supreme Court implicitly rejected those arguments when it denied Judge Hunter's motion. Consequently, review of these claims is essentially an appeal from the order of the New Jersey Supreme Court which is barred by *Rooker–Feldman*.

### 2. The Alleged Facial Challenge to the Rules Governing Judicial Discipline

■ Seeking to avoid defeat at the hands of the *Rooker–Feldman* doctrine, Judge Hunter asks this Court to focus on Count 2 of his Complaint, which Judge Hunter argues is a facial challenge to the disciplinary rules themselves. Count 2 alleges that the New Jersey Court Rules 2:15–1 et seq. are unconstitutional because they violate the Due Process and Equal Protection[8] clauses of the Fourteenth Amendment. Specifically, plaintiff alleges that the rules are unconstitutional because they do not provide judges with "post-deprivation review hearings, with the associated rights to submit legal briefs, to have oral argument, and to receive a statement of reasons for the Court's rulings." Complaint at 12–13. In Count 2, plaintiff seeks a declaration that the rules are unconstitutional and a preliminary and permanent injunction barring the defendants from instituting future disciplinary proceedings under the rules.

Defendants contend that although Count 2 appears to be a general challenge, it is actually a disguised attempt to seek review of the reprimand. *See Stern v. Nix,* 840 F.2d 208 (3d Cir.1988). In *Stern,* the Court dismissed a Complaint by a disbarred Pennsylvania attorney challenging two Pennsylvania disciplinary rules. The Complaint expressly indicated that the attorney did not seek direct review but intended to generally challenge the constitutionality of the rules. The Court concluded that "[d]espite this genuflecting to the *Rooker–Feldman* doctrine," the purpose of the action was to reverse the decision of the Supreme Court of Pennsylvania to disbar the plaintiff. The Court reasoned that the Complaint contained excessive factual detail and sought a permanent injunction preventing the Pennsylvania Supreme Court from disbarring attorneys without employing certain procedural safeguards. The Court concluded that by granting the injunction, it "would effectively reverse the state court judgment."

In *Centifanti v. Nix,* however, the Third Circuit permitted a general constitutional challenge to Pennsylvania court rules regarding reinstatement of suspended attorneys. In contrast to Stern, Centifanti sought *prospective* injunctive relief requiring any *future* disciplinary proceedings to comply with due process.

After reviewing *Centifanti* and *Stern,* the Court concludes that Count 2 of Judge Hunter's Complaint does not withstand the *Rooker–Feldman* doctrine. While it appears that like the plaintiff in *Centifanti,* Judge Hunter is seeking only prospective relief in Count 2, it is apparent from the oral argument that the purpose of the challenge to the rules is to undercut the basis for the private reprimand in order to invalidate the reprimand. Conse-

---

8. As noted above, plaintiff abandoned the Equal Protection claim at oral argument.

quently, Count 2 is barred by the *Rooker–Feldman* doctrine.

■ Even if Count 2 could be read as a challenge to the rules themselves, the Count must be dismissed because it is barred by the doctrine of claim preclusion. "When a litigant expects that a court is willing to consider its legal claims, raises some of those claims, and has those claims adjudicated, it makes sense to apply normal principles of claim preclusion to hold that the litigant has waived any legal claims he or she fails to raise which have arisen from the same transaction as those claims a litigant did raise." *Guarino*, 11 F.3d at 1160.

In *Guarino*, the Third Circuit held that Judge Guarino waived his liberty based due process claim by not raising it at an order to show cause hearing held by the Court. The Court recognized that Judge Guarino did not raise any constitutional claims to the Court, and therefore he may have believed that the Court would not consider them. Nevertheless, the Court reasoned:

> When the "administrator" making a decision is a state supreme court and that state supreme court presents a litigant with an opportunity to present arguments to the court, it is reasonable for a party to expect that such a body will entertain constitutional challenges to its actions and to expect litigants to be on notice of this possibility, even if the state court seems to be acting in an administrative capacity.

*Guarino*, 11 F.3d at 1161.

Unlike Judge Guarino, Judge Hunter had notice that the Supreme Court would consider his constitutional claims. As noted above, Rule 2:15–19 provides that judges may raise constitutional claims to the ACJC which "shall be preserved pending Supreme Court review of the matter on the merits." After receiving the Committee's recommendation, Mr. Kuntzler presented a laches argument to the Supreme Court but failed to make any constitutional arguments at that time. Subsequently, however, in his motion for reconsideration, Mr. Kuntzler presented several constitutional arguments to the Supreme Court: (1) the private reprimand was punishment for the exercise of Judge Hunter's First and Fourteenth Amendment rights; (2)

the First Count was vague and overbroad; (3) the proceedings violated due process; (4) the ACJC acted arbitrarily and capriciously and denied Judge Hunter a fair hearing by admitting a certification of Ms. Sammarco that was taken without notice to Judge Hunter, thus violating his right to confrontation under the Sixth and Fourteenth Amendments; and (5) Rule 2:15–7 regarding judicial cooperation was overbroad and vague.

Not only did Judge Hunter have the opportunity to raise all of his constitutional claims, but the Rules put him on notice of his ability to do so. Consequently, Count 2 is barred by the doctrine of claim preclusion. Furthermore, even if claim preclusion did not apply, Count 2 must be dismissed for the reasons discussed in Section D below.

### B. *Eleventh Amendment Immunity*

The defendants argue that even if *Rooker–Feldman* does not apply, plaintiff's claims are barred by the Eleventh Amendment. Whether the ACJC enjoys Eleventh Amendment immunity is an issue that has not been addressed in this Circuit.

The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State.

The Eleventh Amendment is based on the supposition that "each State is a sovereign entity in our federal system ... [and] it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent." *Seminole Tribe of Florida v. Florida*, — U.S. —, —, 116 S.Ct. 1114, 1122, 134 L.Ed.2d 252 (1996) (citations and internal quotations omitted), *cert. denied*, — U.S. —, 116 S.Ct. 1416, 134 L.Ed.2d 541 (1996). The Amendment prohibits suits against a state by its own citizens, as well as citizens from other states. *Pennhurst State Sch. v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984). "[T]he relief sought by a plaintiff suing a State is irrelevant to the question whether the suit is barred by the Eleventh

Amendment." *Seminole*, —— U.S. ——, 116 S.Ct. at 1124.

### 1. The Institutional Defendants

■ Both the Supreme Court of New Jersey and the ACJC enjoy Eleventh Amendment immunity. The Supreme Court of New Jersey is protected by the state's sovereign immunity because "the judicial branch is an integral part of the state of New Jersey." *See Johnson v. State of New Jersey*, 869 F.Supp. 289, 296 (D.N.J.1994) (holding that the Superior Court of New Jersey is protected by the Eleventh Amendment). Other courts that have considered whether Eleventh Amendment immunity extends to the judiciary have reached the same conclusion. *See Id.* at 296 (citing cases). Consequently, the Court concludes that all of plaintiff's claims against the New Jersey Supreme Court are barred by the Eleventh Amendment.

■ The ACJC is also entitled to Eleventh Amendment immunity. In *Urbano v. Board of Managers*, 415 F.2d 247 (3d Cir.1969), the Third Circuit set forth nine factors that courts should consider in determining whether Eleventh Amendment immunity extends to a given entity. *Id.* at 251–52. In *Fitchik v. New Jersey Transit Rail Operations, Inc.*, 873 F.2d 655 (3d Cir.1989) (en banc), *cert. denied*, 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 107 (1989), the Court divided the factors from *Urbano* into three larger questions, no one of which is entirely dispositive:

(1) Whether the money that would pay the judgment would come from the state (this includes three of the *Urbano* factors—whether payment will come from the state's treasury, whether the agency has the money to satisfy the judgment, and whether the sovereign has immunized itself from responsibility for the agency's debts);

(2) The status of the agency under state law (this includes four factors—how state law treats the agency generally, whether the entity is separately incorporated, whether the agency can sue or be sued in its own right, and whether it is immune from state taxation); and

(3) What degree of autonomy the agency has.

*Id.* at 659.

The Third Circuit has further instructed that "[a]lthough no single *Urbano* factor is dispositive, the most important is whether any judgment would be paid from the state treasury." *Id.; see also Bolden v. Southeastern Pa. Transp. Auth.*, 953 F.2d 807, 818 (3d Cir.1991) (en banc) (same), *cert. denied*, 504 U.S. 943, 112 S.Ct. 2281, 119 L.Ed.2d 206 (1992). Additionally, the Supreme Court has recently noted with approval that "Courts of Appeals have recognized the vulnerability of the State's purse as the most salient factor in Eleventh Amendment determinations." *Hess v. Port Authority Trans–Hudson Corp.*, 513 U.S. 30, 48, 115 S.Ct. 394, 404, 130 L.Ed.2d 245 (1994).

In *Johnson*, the Court held that the Administrative Office of the Courts was entitled to Eleventh Amendment immunity. *Johnson*, 869 F.Supp. at 297. The Court noted that "the few courts that have examined agencies relating to the state judiciary have consistently found these agencies are immune from suit under the Eleventh Amendment." *Id.* (citing *Mattas v. Supreme Court of Pennsylvania*, 576 F.Supp. 1178, 1182 (W.D.Pa.1983) (Office of Disciplinary Counsel immune); *Hendrix v. Indiana State Public Defender System*, 581 F.Supp. 31, 32 (N.D.Ind.1984) (Indiana Public Defender System immune)).

This Court concludes that the ACJC is also entitled to Eleventh Amendment immunity. The ACJC is a court committee established by court rule. Rule 2:15–1. Its function is to "implement N.J.S. 2A:1B–10, [currently 2B:2A–10] providing for suspension prior to hearing, and to assist otherwise in fulfilling the administrative responsibilities of the Court." *Id.* Because the ACJC is a committee of the Supreme Court, the State of New Jersey would be responsible for any damage award against the ACJC. Therefore, the claims against the ACJC are also barred by the Eleventh Amendment.

### 2. The Individual Defendants

■ The damage claims against former Chief Justice Wilentz and Judge Schreiber,

former Chairperson of the ACJC, are also barred by the Eleventh Amendment. There are two types of suits against public officials: individual or personal-capacity suits and official-capacity suits. "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 3104, 87 L.Ed.2d 114 (1985) (internal quotations and citations omitted).

With respect to state officials sued in their official capacities, the Eleventh Amendment precludes a federal court from awarding retroactive damages because the state is the real party in interest; in other words, any damage award would be paid from the state treasury, in contravention of the Eleventh Amendment. *See Edelman v. Jordan,* 415 U.S. 651, 662–65, 94 S.Ct. 1347, 1355–57, 39 L.Ed.2d 662 (1974) (the Eleventh Amendment may bar a suit even though a state is not named as a party to the action, provided the state is the real party in interest). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky,* 473 U.S. at 166, 105 S.Ct. at 3105.

Furthermore, "[n]either a State nor its officials acting in their official capacities are 'persons' within the meaning of § 1983." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989). Although "state officials literally are persons … a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Id.* (citations omitted).

Although the Complaint does not specifically identify the capacity in which Judge Hunter is suing Justice Wilentz and Judge Schreiber, plaintiff's counsel indicated at oral argument that Judge Hunter is suing them in their official capacities. Because the plaintiff asserts claims for damages against the defendants in their official capacities, he has failed to state a claim under § 1983. *See Will,* 491 U.S. at 71, 109 S.Ct. at 2312. The official-capacity suits against Justice Wilentz and Judge Schreiber are also barred by the Eleventh Amendment because they are actually suits against the ACJC and the Supreme Court.

Although the Eleventh Amendment bars damage claims against state officers, it does not bar actions against state officers seeking solely declaratory and injunctive relief. In *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Supreme Court held that a suit to enjoin a state officer from acting pursuant to an allegedly unconstitutional state statute was not barred by the Eleventh Amendment. The Court reasoned that if the officer was acting pursuant to an unconstitutional statute, he was not protected by the Eleventh Amendment because the state authorization was invalid.

■ The Supreme Court has consistently reiterated that the Eleventh Amendment does not preclude prospective relief against a state officer to remedy an ongoing violation of federal law. *See Papasan v. Allain,* 478 U.S. 265, 278, 106 S.Ct. 2932, 2940, 92 L.Ed.2d 209 (1986); *Green v. Mansour,* 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1986); *Milliken v. Bradley,* 433 U.S. 267, 289–90, 97 S.Ct. 2749, 2761–62, 53 L.Ed.2d 745 (1977); *Edelman v. Jordan,* 415 U.S. 651, 664–68, 94 S.Ct. 1347, 1356–58, 39 L.Ed.2d 662 (1974). Therefore, if Count 2 is interpreted as a facial challenge requesting solely injunctive relief, it would not be barred by the Eleventh Amendment. Nevertheless, Count 2 must be dismissed as discussed in Section D of this opinion because the rules governing judicial discipline are not constitutionally infirm.

### C. *Absolute Judicial Immunity*

Defendants also argue that plaintiff's claims are barred by the doctrine of absolute judicial immunity. The doctrine of judicial immunity is well-established. In order to preserve the integrity of the judiciary, judges must be free to act without fear of personal reprisal. *Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978). Conse-

quently, judges are absolutely immune from liability or damages for acts committed within their judicial discretion. *Pierson v. Ray,* 386 U.S. 547, 553–54, 87 S.Ct. 1213, 1217–18, 18 L.Ed.2d 288 (1967). In order for judicial immunity to apply, the action must be a judicial act, and the judge must have had jurisdiction over the subject matter before him when he acted. *Stump,* 435 U.S. at 355–57, 98 S.Ct. at 1104–05.

■ Because the suit is against the defendants in their official capacities, the defense of judicial immunity does not come into play. As discussed above, a suit against state officers in their official capacities is a suit against the state itself. Therefore, personal immunities are not available. *See Kentucky,* 473 U.S. at 166–67, 105 S.Ct. at 3105–06. "The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment." *Id.* at 167, 105 S.Ct. at 3106.

■ Assuming that this suit were an action against the defendants in their individual capacities, the New Jersey Supreme Court and Justice Wilentz would be entitled to absolute judicial immunity. Justice Wilentz and the New Jersey Supreme Court were acting in a judicial capacity both when they issued the reprimand and when they denied the motion for reconsideration. As discussed above, the Supreme Court has jurisdiction over judicial discipline. Therefore, Justice Wilentz and the New Jersey Supreme Court satisfy the requirements for absolute judicial immunity.

It is likely that absolute judicial immunity would also encompass the actions of the ACJC and Judge Schreiber. At least one court has held that bar association committees acting under the aegis of the Supreme Court in the performance of its responsibilities for attorney and judicial discipline are entitled to share in judicial immunity. *See Cohran,* 790 F.Supp. at 1575–1576; *see also Sparks v. Character and Fitness Committee of Kentucky,* 859 F.2d 428 (6th Cir.1988), *cert. denied,* 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989) (members of Committee on Character and Fitness entitled to judicial immunity). The Court need not reach this issue, however, because judicial immunity is not applicable in official capacity suits.

■ Even if absolute judicial immunity were applicable, it would not bar the allegedly prospective relief sought in Count 2. In *Pulliam v. Allen,* 466 U.S. 522, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984), the United States Supreme Court held that absolute judicial immunity is not a bar to declaratory and injunctive relief. The Court reasoned that "[w]e have never had a rule of absolute judicial immunity from prospective relief, and there is no evidence that the absence of that immunity has had a chilling effect on judicial independence." *Id.* at 536, 104 S.Ct. at 1978. The Court also held that attorney's fees are available under § 1983 even in cases where judicial immunity would bar a damage award. Thus, Count 2 would not be barred by the doctrine of judicial immunity. But Count 2, if a pure facial challenge, still must be dismissed, however, because it fails to state a cognizable due process claim.

## D. *Due Process*

The Court has already determined that it does not have jurisdiction over Count 2 because it is not really a facial challenge to the rules themselves but a disguised attempt to have this Court reverse the Supreme Court's decisions, which of course this Court can not do under the *Rooker–Feldman* doctrine. There is, however, language in the Complaint which, if divorced from the briefs and oral argument, supports Judge Hunter's claim that he is challenging the constitutionality of the rules themselves and not their application to him. As we've seen, the *Rooker–Feldman* doctrine would not bar such a challenge. Because of this, the court will tackle head on Judge Hunter's claim that the disciplinary rules violate the Due Process clause of the Fourteenth Amendment.

Judge Hunter contends that although Rule 2:15–19 provides that constitutional challenges "shall be preserved pending Supreme Court review of the matter on the merits," the rules do not establish an adequate procedure for review of constitutional claims. De-

fendants contend that Count 2 fails to state a claim upon which relief can be granted.

### 1. 12(b)(6) standard

Rule 12(b)(6) allows a party to move for a dismissal based upon the pleader's "failure to state a claim upon which relief can be granted." As the long-established federal policy of civil litigation is to decide cases on the proofs, *Melo–Sonics Corp. v. Cropp,* 342 F.2d 856 (3d Cir.1965), the district courts generally disfavor Rule 12(b)(6) motions. *Panek v. Bogucz,* 718 F.Supp. 1228, 1229 (D.N.J.1989).

In deciding a motion to dismiss for failure to state a claim, all allegations in the pleadings must be accepted as true, and the plaintiff must be given the benefit of every favorable inference that can be drawn from those allegations. *See Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957); *Wisniewski v. Johns–Manville Corp.,* 812 F.2d 81, 83 n. 1 (3d Cir.1987). "All the rules require is a short and plain statement of the claim that gives the defendant fair notice of the plaintiff's claim and the grounds upon which it rests." *Conley,* 355 U.S. at 47, 78 S.Ct. at 103.

The rule, however, does require that the pleader "state a claim upon which relief can be granted." Having accepted the facts in the pleadings as true, and giving them all reasonable inferences, the Court may dismiss under Rule 12(b)(6) where the pleadings lack any cognizable basis in the law.

Pursuant to Rule 12(b)(6), a plaintiff's complaint must be dismissed for failure to state a claim if a defendant demonstrates "beyond a doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. at 45–46, 78 S.Ct. at 101–02; *Craftmatic Securities Litigation v. Kraftsow,* 890 F.2d 628, 634 (3d Cir.1989); *Johnsrud v. Carter,* 620 F.2d 29, 33 (3d Cir.1980).

### 2. Alleged Procedural Defects

Due process requires " 'that an individual be given an opportunity for a hearing before he is deprived of any significant property interest.' " *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1492, 84 L.Ed.2d 494 (1985) quoting *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971). The type of predeprivation hearing required by the due process clause varies with the nature of the deprivation and the available postdeprivation remedies. The Court must take into consideration the individual's interest in maintaining the property, the risk of an inaccurate decision, and the governmental interest in prompt termination. *Loudermill,* 470 U.S. at 542–43, 105 S.Ct. at 1493–94.

"The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Loudermill,* 470 U.S. at 546, 105 S.Ct. at 1495.

■ In order to prevail on his due process claim, Judge Hunter must first establish that a private reprimand somehow deprived him of a property or liberty interest protected by the due process clause. *See id.* at 538, 105 S.Ct. at 1491. It is not self-evident to this Court that a private reprimand of a tenured judge constitutes a constitutional deprivation of any kind. The Court is not inclined to embark on what would be an arduous and exhausting journey because even if the private reprimand were a constitutional deprivation, the disciplinary rules satisfy the requirements of due process.

The disciplinary rules provide judges with notice of complaints against them and give them several opportunities to respond. The judge has the opportunity to present informal statements to the Committee during the preliminary investigation. Pursuant to Rule 2:15–10, if the complaint proceeds beyond the preliminary investigation, the judge is entitled to "present such matters as the judge may choose" to the Committee and has the right to appear before it. If the Committee recommends formal proceedings, the judge has the opportunity to move in writing before the Supreme Court for an order denying the recommendation. Furthermore, if the Committee recommends removal, the Supreme

Court must issue an order to show cause why the judge should not be removed. It is true that the judge need not be made aware of a criticism or complaint where the preliminary investigation "does not disclose sufficient cause to warrant further proceedings." Rule 2:15–8(c); *see also* 2:15–9. But as far as due process is concerned, that falls into the category of "no harm, no foul."

Judge Hunter's experience exemplifies the opportunities for response. During the Committee's preliminary investigation, it solicited Judge Hunter's comments and provided him with the opportunity to appear before it. After the committee filed its formal complaint, Judge Hunter filed a 12 page "Answer and Demurrer and/or Motion to Dismiss." Judge Hunter appeared at a hearing before the Committee where he had the opportunity to make a statement, produce documents, and present witnesses. The Supreme Court reviewed the Committee's recommendation and the record and issued its decision. The independent nature of the Supreme Court's review is evidenced by the fact that contrary to the Committee's recommendation, the Supreme Court decided to dismiss Mr. Sammarco's complaint. This process satisfies the *Loudermill* requirements of notice, an explanation of the charges, and an opportunity to respond.

Plaintiff raises three challenges to the rules. His first argument is that the rules "fail to provide a petitioner with a pre-determination hearing before the Justices of the New Jersey Supreme Court, or any judicial forum, and oral argument to initially raise constitutional issues that could not be legally raised at the evidentiary hearing before the non-judicial body, the Advisory Committee on Judicial Conduct." Complaint at 11 ¶ 7. This argument essentially contends that the rules are defective because they do not provide for a predetermination hearing before a judicial forum.

This argument is contradicted by the rules themselves. The rules provide for a pre-deprivation hearing before the ACJC. It is the Court, not the ACJC, however, that makes the final decision to discipline a judge. Although the Rules do not require a formal "hearing" before the Court itself, the Court reviews the record of the Committee and makes an independent judgment regarding discipline. *See Matter of Yaccarino*, 101 N.J. 342, 350, 502 A.2d 3 (1985).(in judicial removal proceedings, "the final determinations of fact are made by this Court after its independent review of the record"). Furthermore, pursuant to Rule 2:15–13, the judges have the opportunity to "move in writing before the Supreme Court ... for an order denying or rejecting the [Committee's] recommendation for institution of formal proceedings."

■ Even if the ACJC acted without Supreme Court review [9], the failure to provide a full hearing before the Supreme Court is not a due process violation. Judges have a full hearing before the ACJC. Due process does not require a hearing before a particular decision maker, or a hearing at more than one step in the process. *Opp Cotton Mills v. Administrator*, 312 U.S. 126, 152, 61 S.Ct. 524, 536, 85 L.Ed. 624 (1941). Due process also does not require a predetermination hearing before a judicial body. *See, e.g., Guralnick v. Supreme Court of New Jersey*, 747 F.Supp. 1109, 1113 (D.N.J.1990) (holding that New Jersey Fee Arbitration System under which binding arbitration hearing is conducted before Fee Arbitration Committee composed of attorneys and laymen comports with due process), *aff'd*, 961 F.2d 209 (3d Cir.1992). Thus, the first basis for Judge Hunter's due process argument fails to state a claim upon which relief can be granted.

Judge Hunter's second argument is that the rules "do not provide for a post-determination hearing before a judicial forum, allowing for the submission of legal briefs and oral argument, to address procedural and substantive due process infractions committed by the ACJC in its evidentiary hearing." *Id.* ¶ 8. Based on plaintiff's brief, the Court concludes that the essence of this challenge is that if the ACJC is biased, judges are entitled to another hearing before an unbiased decision maker. *See McDaniels v. Flick*, 59 F.3d 446, 458–461 (1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1017, 134 L.Ed.2d 97 (1996).

**9.** The court notes that the rules do not expressly empower the ACJC to issue private reprimands.

In *McDaniels*, the Third Circuit rejected a due process challenge by a tenured professor who alleged that the pretermination procedure was a sham and the university was predisposed to dismiss him. The Court held that because the professor could obtain a post-termination review by a state court, the alleged bias did not constitute a deprivation of due process. The Court reasoned:

> While these charges [of bias] may have merit in certain cases, to require that the state ensure an impartial pretermination hearing in every instance would as a practical matter require that termination decisions initially be made by an outside party rather than the employer, as charges of bias always could be made following an in-house discharge.... On the whole, we do not think that such excessive pretermination precaution is necessary where the state provides a neutral tribunal at the post-termination stage that can resolve charges of improper motives.

Even if a judge could prove that the ACJC was biased, the Rules provide a mechanism for resolving charges of bias. The Supreme Court conducts an independent review of the record and recommendation. The judge can present objections regarding the Committee's conduct directly to the Supreme Court in a motion to reject the Committee's recommendation and constitutional objections raised to the ACJC are preserved for Supreme Court review. Rule 2:15–13, 2:15–19, 2:15–12. If the judge is not satisfied with the New Jersey Supreme Court's decision with respect to federal constitutional issues, he can seek review in the United States Supreme Court. Thus, plaintiff's second due process challenge also fails to state a claim on which relief can be granted.

Judge Hunter's third argument is that the rules "do not require the Supreme Court of New Jersey to issue a statement of reasons when the Justices decline to hear a petitioner's timely application for review of an ACJC recommendation to the Court, nor require the Supreme Court to issue a statement of reasons when the Justices decline a timely application for a post-deprivation hearing." *Id.* ¶ 9. This objection also does not state a claim upon which relief can be granted.

First, as previously noted, the Supreme Court automatically reviews the recommendation by the ACJC and the accompanying record. Thus, the petitioner need not make an application for review of the ACJC recommendation. Taking all inferences in favor of the plaintiff, the Court presumes that he considers that the Supreme Court's decision to deny oral argument prior to taking action on the Committee's recommendation tantamount to denying an application for review of the recommendation. Similarly, the Court concludes that Judge Hunter equates denying oral argument on his motion for reconsideration with "decline[ing] a timely application for a post-deprivation hearing."

The due process clause does not require oral argument prior to all types of deprivations. *Federal Communications Comm. v. WJR*, 337 U.S. 265, 69 S.Ct. 1097, 93 L.Ed. 1353 (1949). Instead, "the right of oral argument as a matter of procedural due process varies from case to case in accordance with differing circumstances, as do other procedural regulations." *Id.* at 276, 69 S.Ct. at 1103.

If due process always required oral argument, numerous court rules authorizing judicial disposition of controversies without argument would be unconstitutional. In fact, Rule 2:11–6 specifically provides that a motion for reconsideration "will not be argued orally." The denial of oral argument is simply not equivalent to a refusal to consider petitioner's arguments.

In the case of a tenured public employee, the United States Supreme Court has stated that due process requires "[t]he opportunity to present reasons, either in person *or in writing*, why proposed action should not be taken." *Loudermill*, 470 U.S. at 546, 105 S.Ct. at 1495 (emphasis added). Thus, the plaintiff's third argument also fails to identify a due process violation.

### III. *CONCLUSION*

The complaint must be dismissed because it does not state a claim upon which relief can be granted. The process leading to the Supreme Court's private reprimand was ample in theory and in fact. Judge Hunter had

notice of the charge. He was afforded an evidentiary hearing which he attended and where he was represented by counsel. His counsel wrote to the Supreme Court in response to the written decision of the Advisory Committee on Judicial Conduct before the Supreme Court issued its decision. He had the benefit of a *de novo* review of the Committee's record and report. And he was given the opportunity to raise belatedly his constitutional concerns to the Supreme Court by way of a motion for reconsideration. What he wasn't given was oral argument before the Supreme Court and a written decision denying his motion for reconsideration.

Whatever the merit of these constitutional concerns they can only be addressed by the Supreme Court of the United States. Although the federal judiciary is sometimes called the imperial judiciary, the fact is the imperium of this Court does not extend to reviewing final decisions of the highest court of New Jersey. As to the infelicitous wording of the rules governing judicial discipline, it is not of a constitutional dimension; recourse is to the appropriate rules committee, not this Court.