**Luther C. EDMONDS, Plaintiff,**

v.

**John E. CLARKSON, et al., Defendants.**

**No. CIV. A. 2:97CV364.**

United States District Court,
E.D. Virginia,
Norfolk Division.

March 11, 1998.

**542**

Luther C. Edmonds, Pro Se.

Mary Elizabeth Shea, Attorney General's Office of Virginia, Richmond, VA, for Defendants.

## MEMORANDUM OPINION
## AND ORDER

PAYNE, District Judge.

This action was filed by a former state court judge alleging the deprivation of federal constitutional rights and asserting claims under Virginia common and statutory law. The defendants are Virginia's judicial review board, its former chairman and former counsel, several state circuit court judges, and a state court clerk. For the reasons set forth below, the action is dismissed.

## BACKGROUND

Luther C. Edmonds, a former judge of the Circuit Court for the City of Norfolk, filed this action against (i) eight of his former judicial colleagues (collectively, the "Norfolk Judges");[1] (ii) the Clerk of the Circuit Court of the City of Norfolk, Albert Teich; (iii) the Commonwealth of Virginia Judicial Inquiry and Review Commission ("JIRC"); (iv) the Honorable Paul F. Sheridan, a state circuit court judge and the former Chairman of the JIRC; and (v) Reno S. Harp, III, former Counsel for the JIRC.[2] The principal focus of the Complaint is the institution and prosecution of charges brought by the JIRC against Edmonds. Each of the eight counts presents a claim based on the motivation and conduct of persons who brought certain matters to the attention of the JIRC, who testified in its proceedings, or who conducted the JIRC proceedings.

The saga recited in the Complaint began on March 20, 1996[3] when a black bondsman complained about the suspension of his bonding privileges by the Norfolk Judges, acting pursuant to Va.Code § Ann. 19.2–152.1 (Michie Supp.1997). The review and suspension of bonding privileges under the auspices of that statute are judicial functions which are entrusted only to state court judges *Battle v. Whitehurst,* 831 F.Supp. 522, 527 (E.D.Va. 1993). After receiving the bondsman's complaint, Edmonds decided to review the files of all bondsmen certified by the Norfolk court. In furtherance of that mission, Edmonds directed Teich to assemble the files of all certified bondsmen. After consulting with the Chief Judge of the Norfolk court and counsel in the office of Virginia's Attorney General, Teich made the requested files available and Edmonds reviewed them.[4]

According to the Complaint, Edmonds' review disclosed numerous deficiencies and irregularities in the files of many, if not most, of the bondsmen certified by the Norfolk court. Edmonds prepared a memorandum outlining his conclusions and presented it at a meeting of the Norfolk Judges on April 3 ("April 3 memorandum"). The Norfolk Judges discussed a procedure for considering the deficiencies which Edmonds had disclosed and Edmonds and Judge Rutherford were designated to further investigate the matter. However, Edmonds and Judge Rutherford had different understandings respecting the procedure which had been discussed. This led to friction between Edmonds and Judge Rutherford, and Chief Judge Taylor called an emergency meeting of the Norfolk Judges on April 12 to discuss the issue.

During the April 12 meeting, Edmonds called Judge Rutherford a liar, thereby prompting criticism of Edmonds by other judges in attendance. In addition, there were discussions about previous actions which had been filed against the Norfolk Judges in federal court by a black bondsman,

---

1. These defendants include the Honorables John E. Clarkson, Marc Jacobson, Jerome James, Everette A. Martin, Jr., John C. Morrison, Jr., Charles E. Poston, William T. Rutherford, and Lydia C. Taylor, all judges of the Circuit Court for the City of Norfolk.

2. Edmonds later filed a motion to amend the Complaint to add former Governor George Allen and the Virginia General Assembly as defendants. That motion was denied for the reasons set forth on the record. This opinion, therefore, does not address any claims against the former Governor or the General Assembly. As an elect-

ed official, Teich filed a separate motion to dismiss.

3. All dates are in 1996 unless stated otherwise.

4. The Complaint makes no specific charges against Teich other than his delay in providing the files to Edmonds. However, Teich is indirectly implicated in other charges because the Complaint uses the term "defendants" very loosely to describe conduct alleged to give rise to Edmonds' claims.

Sherry Battle ("Battle"), in which Battle alleged that the suspension of her bonding privileges was discriminatory. In the colloquy about Battle, Judge Morrison "stated that he had heard rumors that Edmonds had an affair with Sherry Battle." Although the Complaint alleges that rumors to that effect had been circulating for years, Edmonds apparently was offended at the remark and promptly left the meeting.

Thereafter, Edmonds continued to review the bondsmen's files, including Battle's; and, from time to time, he conversed with several of the Norfolk Judges about his findings and the April 3 memorandum. On April 15, Edmonds approached Judge Morrison to discuss the topic of the Norfolk bondsmen. During that discussion, Judge Morrison allegedly called Battle a "black son-of-a-bitch" and asked Edmonds why he was so "fired up about this bonding thing?" Further discussion ensued, during which Judge Morrison is alleged to have said that the Norfolk Judges had the JIRC and a state lawmaker "on their side."

On April 26, Edmonds formally requested the Supreme Court of Virginia to exercise its supervisory power and to conduct a review of the files respecting bondsmen certified by the Norfolk court. The Supreme Court of Virginia declined Edmonds' request on May 7 because the matter was under consideration by the Norfolk court.

Then, in early May, Edmonds presided over two bond forfeiture proceedings as to which Battle was the bonding agent. This prompted complaints that Edmonds had violated ethical rules respecting judicial conflicts of interest by deciding a case involving a person with whom he allegedly was romantically involved. The record is unclear who first raised this issue, but Edmonds' pleadings suggest that the Norfolk Judges brought the issue to the attention of the JIRC.

Shortly thereafter, the JIRC began an inquiry into the conflict of interest complaints and other charges. Edmonds alleges that, from May 30 to June 11, a state lawmaker, a state court judge from Portsmouth, and another person, purportedly acting as "messengers for Defendants," encouraged Edmonds

to resign rather than to face a formal inquiry by the JIRC. Edmonds refused these entreaties.

On June 12, the JIRC filed a formal complaint against Edmonds alleging that he had violated judicial ethics by hearing cases involving Battle while he was romantically involved with her and by assaulting his wife and son with a pistol. A formal hearing on these charges began on September 10 with Judge Sheridan presiding. Harp, the JIRC's counsel, presented the case against Edmonds. Although it is not entirely clear from the pleadings, it appears that Harp also had been in charge of the JIRC investigation which preceded the hearing.

At the September 10 hearing, counsel for Edmonds opposed the calling of Edmonds' wife as a witness because she was recovering from heart bypass surgery. Judge Sheridan denied the request and held that Edmonds' wife would be required to testify during the hearing. According to the Complaint, Edmonds resigned his judgeship to avoid the necessity of his wife's testimony.

The Complaint sets forth other miscellaneous charges against one or more of the defendants. However, the foregoing core allegations comprise the basis of the eight counts in which Edmonds seeks compensatory damages of $40 million, punitive damages of $10 million, an injunction requiring that he be reinstated as a state court judge, and an award of attorneys fees and costs.

Count I alleges that the defendants retaliated against Edmonds for exercising his First Amendment right to free speech respecting the situation involving the Norfolk court bondsmen. Count II alleges that the defendants affirmatively abused their power. Count III sets forth a claim for the denial of a property interest in the judicial position which Edmonds resigned. Count IV alleges racial discrimination because a white jurist investigated by the JIRC in the fall of 1996 allegedly was treated differently than Edmonds, albeit with respect to charges which did not remotely resemble those brought against Edmonds.

Count V asserts a state law claim of defamation, but does not identify the allegedly

defamatory words. Count VI is a state law claim for intentional infliction of emotional distress. Count VII purports to assert a claim for "capricious and arbitrary action."[5] Count VIII charges a conspiracy to injure another in his profession under Va.Code Ann. § 18.2–499.

The Norfolk Judges, the JIRC, Judge Sheridan, Harp and Teich have moved to dismiss the action for various reasons. Each also presents a threshhold challenge to the Court's jurisdiction over the subject matter of the action.

## DISCUSSION

 It is somewhat difficult to understand the legal predicate for most of Edmonds' claims, and it is even more difficult to understand the reasoning employed by Edmonds in response to the motions seeking dismissal of the action. Ordinarily, courts are obligated to construe leniently pleadings prepared by *pro se* litigants. However, as one trained in the law and supposedly skilled enough in it to be a judge, Edmonds is not entitled to the measure of leniency accorded to other *pro se* litigants.

Having sought to discern the basis for Edmonds' claims, the Court concludes that they are highly suspect, if not entirely lacking in merit. However, it is not necessary to reach the merits of Edmonds' federal claims because the Court is without jurisdiction to entertain them.

### A. Jurisdictional Issues: Applicability of the *Rooker–Feldman* Doctrine

### 1. The *Rooker–Feldman* Doctrine

 The defendants assert that the Court lacks subject matter jurisdiction over any of Edmonds' federal constitutional claims by virtue of what has become known as the *Rooker–Feldman* doctrine. *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923). The *Rooker–Feldman* doctrine clearly establishes the rule that federal district courts lack jurisdiction to hear constitutional claims that have been adjudicated by state courts or that are "inextricably intertwined with the merits of a state court judgment." *Suarez Corp. Indus. v. McGraw*, 125 F.3d 222, 228 (4th Cir.1997); *see also Jordahl v. Democratic Party of Va.*, 122 F.3d 192, 199 (4th Cir. 1997).[6]

 In *Rooker*, the Supreme Court held that the only federal court empowered to review constitutional claims asserted in a state court is the Supreme Court of the United States. *Rooker*, 263 U.S. at 416. The Court noted that any other rule would confer appellate jurisdiction upon the federal district courts which, of course, are endowed only with original jurisdiction unless expressly otherwise provided by statute.[7] *Id.*

Sixty years later, in *Feldman*, the Supreme Court applied this fundamental jurisdictional principle to preclude federal district court review of constitutional claims which are "inextricably intertwined with" state court decisions which are not reviewable in the inferior federal courts. *Feldman*, 460 U.S. at 483 n. 16. Subsequently, Justice Marshall aptly defined "inextricably intertwined" by stating that:

> [I]t is apparent, as a first step, that the federal claim is inextricably intertwined with the state-court judgment if the federal claim succeeds only to the extent that

---

5. Counts II and VII are tersely worded and are opaque at best. Count II uses the term "affirmative abuse of power." Count VII talismanically invokes the phrase "capricious and arbitrary action," without linking the allegation to any particular conduct. Putting the best face on these two convoluted claims, the Court will consider them as asserting the deprivation of substantive due process.

6. The *Rooker–Feldman* doctrine precludes federal review of lower state court decisions and proceedings, just as it precludes review of the deci-

sions of a state's highest court. *See Jordahl*, 122 F.3d at 199; *Young v. Murphy*, 90 F.3d 1225, 1230 (7th Cir.1996); *Port Auth. Police Benevolent Ass'n, Inc. v. Port Auth. of New York and New Jersey Police Dep't*, 973 F.2d 169, 177 (3d Cir. 1992).

7. Where, as in federal habeas corpus proceedings, Congress has permitted the inferior federal courts to review constitutional decisions made by state courts, the *Rooker–Feldman* doctrine has no application. *Jordahl*, 122 F.3d at 199.

the state court wrongly decided the issues before it. Where federal relief can only be predicated upon a conviction that the state court was wrong, it is difficult to conceive the federal proceeding as, in substance, anything other than a prohibited appeal of the state-court judgment.

*Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 25, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) (Marshall, J., concurring).

Also, in *Feldman,* the Supreme Court expressly acknowledged that the decision in *Rooker* and the rule in *Feldman* might completely foreclose federal review of some constitutional claims. Specifically, the Court observed that: "[b]y failing to raise his claims in state court a plaintiff may forfeit his right to obtain review of the state court decision in any federal court." *Feldman,* 460 U.S. at 483 n. 16.

█ As the Fourth Circuit recently explained, "[t]he *Rooker–Feldman* doctrine divests the district court of jurisdiction where 'entertaining the federal claim should be the equivalent of an appellate review of [the state court] order.'" *Jordahl,* 122 F.3d at 202 (*quoting FOCUS v. Allegheny County Ct. of Common Pleas,* 75 F.3d 834, 840 (3d Cir. 1996)) (alteration in original). The controlling factor in determining the applicability of the *Rooker–Feldman* doctrine is whether the federal district court is requested to pass upon the merits of a state court decision. *Jordahl,* 122 F.3d at 202. Indeed, *Rooker–Feldman* is implicated whenever, " 'in order to grant the federal plaintiff the relief sought, the federal court must determine that the [state] court judgment was erroneously entered or must take action that would render the judgment ineffectual.'" *Id.* (*quoting Ernst v. Child and Youth Servs. of Chester County,* 108 F.3d 486, 491 (3d Cir. 1997)) (alteration in original).

█ The *Rooker–Feldman* doctrine reinforces the principle, central to our system of federalism, that review of state court decisions must be accomplished first in the state appellate system, and eventually in the Su-

preme Court of the United States, and not in the federal district courts. *Jordahl,* 122 F.3d at 202; *Young,* 90 F.3d at 1230; *Hale v. Harney,* 786 F.2d 688, 691 (5th Cir.1986). Of course, the *Rooker–Feldman* doctrine applies only where the plaintiff is seeking, in federal court, "review of, or relief from, a state action or *proceeding* that is essentially *judicial* in nature." *Suarez,* 125 F.3d at 228 (emphasis added).

These general principles form the framework for assessing whether this Court has subject matter jurisdiction over the federal constitutional claims asserted by Edmonds in this action.

### 2. The JIRC Hearing as a *Rooker–Feldman* "Judicial Proceeding"

Edmonds' claims in this action focus upon the commencement and prosecution of, and conduct which occurred in, proceedings which were instituted by the JIRC under Va.Code Ann. § 2.1–37.4 to ascertain whether there was a basis to censure or remove Edmonds because of certain alleged breaches of judicial ethics. Hence, the linch pin of the jurisdictional question presented here is whether the conduct and proceedings of the JIRC are essentially judicial in nature.

The starting point for that assessment is the Constitution of Virginia which confers upon the Supreme Court of Virginia the power to censure, remove, and retire state judges. Va. Const. Art VI, § 10. The Constitution of Virginia also confers upon the JIRC the power and duty to investigate charges which would be the basis for retirement, censure, or removal of a judge by the Supreme Court of Virginia. Va.Code Ann. § 2.1–37.4 (1995); Va. Const. Art. VI, § 10. The JIRC, "after such investigation as it deems necessary," may order and conduct hearings, and subpoena witnesses and documents, at such times and places in the Commonwealth as it shall determine. Va.Code Ann. § 2.1–37.4;[8] Va Const. Art. VI, § 10. If the JIRC finds charges against a Virginia

---

8. Any decision of the JIRC must be concurred in by a majority of its seven members. Va.Code Ann. § 2.1–37.6. The General Assembly appoints the members of the Commission, which must include three judicial members, two lawyer members, and two public members. Va.Code Ann. § 2.1–37.3.

judge to be well-founded, and sufficient in nature and extent to constitute the basis for retirement, censure, or removal, it may file a formal complaint before the Supreme Court of Virginia, which shall conduct a formal public hearing before making its findings. Va. Const. Art. VI, § 10.

In sum, the controlling state constitutional and statutory provisions establish the JIRC as the investigative and prosecutorial arm of the Supreme Court of Virginia in the state-established system for assessing the validity of charges against state judges and for determining the appropriate sanction. That process begins with the filing of a complaint which the JIRC then investigates. A judge under investigation may be represented by counsel in the proceedings before the JIRC; and, although all proceedings before the JIRC are confidential, they clearly are adversarial. A finding by the JIRC that the charges which it has investigated are well-founded can result in retirement, censure, or removal of the judge only if the JIRC files a formal complaint with the Supreme Court of Virginia. Thereafter, the formal hearing conducted by the Supreme Court is, in large part, based on the record of the proceedings before the JIRC.

■■■ For purposes of the *Rooker–Feldman* doctrine, "[a] judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end." *Feldman,* 460 U.S. at 477 (*quoting Prentis v. Atlantic Coast Line Co.,* 211 U.S. 210, 226, 29 S.Ct. 67, 53 L.Ed. 150 (1908); *Ross v. Zavarella,* 732 F.Supp. 1306, 1311 (M.D.Pa.1990); *White v. Judicial Inquiry and Review Bd. of Pennsylvania,* 744 F.Supp. 658, 666 (E.D.Pa.1990)). Whether a proceeding is judicial in nature depends not upon the form of the proceeding, but upon its nature and effect. *Feldman,* 460 U.S. at 481 (*citing In re Summers,* 325 U.S. 561, 567, 65 S.Ct. 1307, 89 L.Ed. 1795 (1945)). Moreover, the nature of a proceeding is determined not by the character of the body conducting the proceedings, but by the character of the proceedings themselves. *Prentis,* 211 U.S. at 226–27; *Hunter v. Supreme Court of New* *Jersey,* 951 F.Supp. 1161, 1171 (D.N.J.1996); *Ross,* 732 F.Supp. at 1310.

■■■ Applying these basic principles, it is unquestionable that the investigation of charges by the JIRC are proceedings which are essentially judicial in nature. First, the JIRC proceedings are an integral part of a constitutional and statutory investigatory and charging process over which the state's highest judicial body presides. Second, that process exists and operates for the purpose of investigating, declaring and enforcing the liability of state judges to censure, or removal from office on the basis of past and present facts under rules and laws already in existence. Third, the character of the JIRC proceedings, and those, if any, which follow in the Supreme Court of Virginia, are quintessentially judicial in character because they carry all the traditional indicia of judicial inquiry and adjudication. Finally, the process is concluded by an order issued by Virginia's highest court.

The JIRC proceedings are the conceptual analog to the bar examination procedure by which the state's highest court uses a board of examiners to judge the intellectual fitness of persons to practice law. And, as this Court held some twenty years ago, the board of bar examiners "performs a judicial function on behalf of the Supreme Court of Virginia." *Woodard v. Virginia Bd. of Bar Examiners,* 454 F.Supp. 4, 5 (E.D.Va.1978), *aff'd,* 598 F.2d 1345 (4th Cir.1979). The JIRC proceedings are substantially more judicial in nature than bar admissions proceedings because the JIRC proceedings, unlike the former, are conducted with virtually all the accoutrement of traditional adjudicative hearings. Additionally, the record made in the JIRC proceeding is both the predicate of, and much of the evidence in, the subsequent adversarial, adjudicative hearing conducted by the Supreme Court of Virginia.

Other courts have concluded that proceedings conducted under judicial disciplinary systems similar to that used by Virginia were judicial proceedings to which the *Rooker–Feldman* doctrine applied. *See White v. Judicial Inquiry and Review Bd.,* 744 F.Supp. 658 (E.D.Pa.1990). The Fifth Circuit determined that the state commission on judicial

conduct's reprimand of a justice of the peace was a "judicial act" for purposes of the *Rooker–Feldman* doctrine because the commission investigated the complaints lodged against the justice of the peace, declared him in violation of the code of judicial conduct, and issued a reprimand. *Scott v. Flowers*, 910 F.2d 201, 208 (5th Cir.1990). In *Guarino v. Larsen*, 11 F.3d 1151 (3d Cir.1993), the Third Circuit applied the *Rooker–Feldman* doctrine to preclude federal inferior court review of constitutional claims arising out of decisions of the Pennsylvania Supreme Court and its court administrator respecting the status of a state judge.

### 3. The Effect of Edmonds' Failure to Present His Constitutional Claims to the JIRC or the Supreme Court of Virginia

Having determined that the JIRC proceedings are judicial in nature, it is necessary to determine whether the constitutional claims which Edmonds brings in this action were adjudicated in the state judiciary proceeding or were inextricably intertwined with those proceedings. There is no contention that either the JIRC or the Supreme Court of Virginia actually adjudicated the constitutional claims which Edmonds presents here. Hence, it is necessary to determine whether they fit the "inextricably intertwined" argument of the *Rooker–Feldman* doctrine.

 Claims that fall within the ambit of the "inextricably intertwined" construction of the preclusive principles of *Rooker–Feldman* include federal constitutional claims which could have been brought in the state proceedings but were not. *Feldman*, 460 U.S. at 483 n. 16. ("By failing to raise his claims in state court a plaintiff may forfeit his right to obtain review of the state court decision in any federal court. This result is eminently defensible on policy grounds.")

 As the Fourth Circuit explained in *Guess v. Board of Medical Examiners*, 967 F.2d 998 (4th Cir.1992), "even if a claim is not presented to a state court, or by inference is not ruled upon [even if presented], a plaintiff is not entitled to bring that claim in federal court if the claim was one that should have been brought in the state court."

*Guess*, 967 F.2d at 1003 (*citing Feldman*, 460 U.S. at 483 n. 16). Moreover, where there exists an available state court appellate procedure, a litigant's "deliberate bypass of those procedures that envisioned (ultimately) a reviewable final state-court judgment, itself under *Feldman* not subject to federal district-court review, should not, it would seem, entitle [the litigant] to a review of his constitutional claims that would have been unavailable to him if he had pursued his claim to final state court judgment." *Thomas v. Kadish*, 748 F.2d 276, 282 (5th Cir.1984).

The Third Circuit, in *Guarino*, applied this principle to dismiss an action filed under 42 U.S.C. § 1983 by a retired state court judge who asserted that the decision revoking his senior status was constitutionally deficient. 11 F.3d at 1152. In *Guarino*, the Pennsylvania Supreme Court was not called upon to decide the plaintiff's constitutional claims because, in an effort to avoid the application of the *Rooker–Feldman* doctrine, the plaintiff did not appear at the show cause hearing or otherwise present his constitutional claims for resolution by the state court. *Id.* at 1161 n. 6. Because the Pennsylvania Supreme Court did not inherently have to consider any of Guarino's constitutional claims in issuing the order which revoked his designation of senior status, the state court's ultimate decision did not, of necessity, signify adjudication of the constitutional claims later presented in the federal action under § 1983. *Id.* at 1160. Nonetheless, the Third Circuit concluded that the plaintiff had waived his claims by failing to submit them to the Pennsylvania Supreme Court for adjudication. The Third Circuit justified its decision by holding that:

> When a litigant fails to attempt to raise such claims, it is appropriate to *presume that the state court would have been willing to decide his constitutional claims subject to rebuttal by clear evidence to the contrary.* Judge Guarino's uncertainty as to whether the Pennsylvania Supreme Court would have considered his constitutional claims is due solely to his own failure to attempt to raise those claims. A litigant suffers no real harm by attempting to raise his or her constitutional claim in state court: if the state court refuses to

address the constitutional claim, the litigant can then raise the claim in federal court without any jurisdictional, abstention, or collateral estoppel problems. Requiring the litigant to attempt to raise those claims is relatively innocuous; we therefore hold that *Judge Guarino waived his opportunity to ensure that the Pennsylvania Supreme Court adjudicated all of his legal claims.*

*Id.* at 1161–62 (citations omitted) (emphasis added). The Third Circuit then held that, under the *Rooker–Feldman* doctrine, a litigant who has been summoned to participate in a state court proceeding must present all of his claims arising from that transaction if he is to avoid waiving them. *Id.* at 1161 n. 7.

Similarly, in *Hunter v. Supreme Court of New Jersey,* 951 F.Supp. 1161 (D.N.J.1996), the court applied the *Rooker–Feldman* doctrine to preclude federal review of constitutional challenges to a reprimand imposed on a state trial judge by the state's highest court. *Hunter,* 951 F.Supp. at 1163. Having concluded that the reprimand constituted a judicial action for purposes of the *Rooker–Feldman* doctrine, the court held that an "opportunity to litigate the constitutional issues was sufficient to invoke the bar of the *Rooker–Feldman* doctrine." *Hunter,* 951 F.Supp. at 1174. After analyzing the New Jersey disciplinary system and the function of the state Advisory Committee on Judicial Conduct in investigating the circumstances which led to the reprimand, the court found that the judge had a "full and fair" opportunity to present his constitutional claims to the judicial inquiry committee and to the New Jersey Supreme Court. *Id.* Moreover, the court concluded that, where the opportunity exists, the failure to take advantage of it will not preclude application of the *Rooker–Feldman* doctrine.

■ The foregoing authorities teach that the inextricably intertwined determination requires comparison of the issues in the state proceedings with those raised in the federal action. In this action, Edmonds alleges that the Norfolk Judges infringed his federal constitutional rights by bringing to the attention of the JIRC the charges which the JIRC investigated, by supplying information to the

JIRC during the investigation, and by being prepared to testify in the JIRC hearing. Edmonds alleges infringement of federal constitutional rights by the JIRC, Judge Sheridan, and Harp in their investigation of the charges against him, and by ordering and conducting a hearing on those charges. Edmonds also asserts generally and vaguely that all the defendants were engaged in a conspiracy by taking the actions they are alleged to have taken.

In sum, Edmonds is proposing in this federal action: (i) to re-examine the conduct of those who directed to the attention of the JIRC the facts which were investigated by the JIRC; (ii) to assess the motives and conduct of those who participated in the investigation and who referred charges for a hearing before the JIRC; and (iii) to measure the conduct of the JIRC hearing and to compare the conduct of the JIRC in investigating Edmonds to the conduct of the JIRC in investigating another judge. Although it is unclear how Edmonds believes the Norfolk Judges and Teich were involved in the actions taken by the JIRC, Judge Sheridan and Harp, the Complaint and other pleadings leave little doubt that, in Edmonds' view, the actions which are at the core of his constitutional claims in this action were somehow taken by, or attributable to, the involvement of the Norfolk Judges in the JIRC proceedings which were underway when Edmonds resigned.

In some fashion then, Edmonds bases the constitutional claims in Counts I–IV and Count VII of the Complaint on matters that could have been presented to the JIRC and to the Supreme Court of Virginia in defense of the charges in the JIRC proceeding. Obviously, if the JIRC proceedings had gone to the hearing stage, there would have been evidence about the circumstances in the Norfolk court which constitute much of the text of Edmonds' Complaint in this action. In like fashion, there would have been evidence about Edmonds' relationship, if any, with Battle. Without doubt, Edmonds could have shown in the JIRC proceedings how his case was similarly situated to that of the JIRC investigation of the white judge which is the comparative centerpiece of Edmonds' equal

protection claim in this action. Nor is there any reason to believe that the JIRC would not have entertained any constitutional defense or, at least, would not have kept Edmonds from raising and preserving them for later review.

Any of the issues raised in the JIRC proceedings could have been reviewed in the subsequent proceedings, if any, before the Supreme Court of Virginia. Even Edmonds' contentions that the JIRC and its officials abused their power or deprived him of substantive due process could have been presented to the Supreme Court of Virginia to the Supreme Court of Virginia, and ultimately by the Supreme Court of the United States, if the matter had proceeded that far.

Therefore, on this record, it is quite clear that the issues which are the predicates of Edmonds' constitutional claims in this court were the actual subject of, or were inextricably intertwined with, state proceedings of a judicial nature. Any award of damages or other relief here would require, of necessity, an adjudication of the issues which were at the core of the JIRC proceedings. Indeed, the principal relief sought by Edmonds— reinstatement—might have been unnecessary had Edmonds presented his case to the JIRC and the Supreme Court of Virginia rather than resigning from office. Consequently, under the *Rooker–Feldman* doctrine, this Court would be without subject matter jurisdiction to entertain those claims if the proceedings had been completed adversely to Edmonds before the JIRC and the Supreme Court of Virginia.[9]

■ That jurisdictional void is not supplied merely by virtue of the fact that Edmonds forestalled an adjudication in the state proceedings by resigning his position, thereby bringing the state proceedings to a premature conclusion. Indeed, *Feldman* teaches as much by explaining that, once the state proceedings are underway, failure to present federal constitutional claims that are inextricably intertwined with the state issues may result in forfeiture of the right to secure

vindication in federal court. *See Feldman,* 460 U.S. at 483 n. 16.

That is precisely the situation which the Third Circuit confronted in *Guarino.* As noted above, the state court judge sought to avoid application of the *Rooker–Feldman* doctrine by deliberately declining to respond to a state supreme court's show cause order and by not presenting constitutional claims in the ensuing review by the Pennsylvania Supreme Court. The Third Circuit held that, by eschewing participation in the process and by declining to raise his constitutional claims, the state judge had waived them. *Guarino,* 11 F.3d at 1161.[10] In so holding, the Third Circuit observed that the refusal of a state court to entertain the federal constitutional claim would permit the assertion of that claim in a subsequent federal action "without any jurisdictional, abstention, or collateral estoppel problems." *Id.*

That is not the rule, however, in the Fourth Circuit, which has determined that even failure of the state tribunal to address presented constitutional claims will not avoid the application of the *Rooker–Feldman* doctrine. Specifically, in *Guess,* our Court of Appeals was confronted with a circumstance in which a plaintiff alleged that the state supreme court had failed to address his constitutional claims in reviewing a decision by the state's board of medical examiners. *Guess,* 967 F.2d at 1003. The Fourth Circuit, nonetheless, imposed the jurisdictional bar of *Rooker–Feldman,* holding that:

> Justice Brennan, in footnote 16 of *Feldman,* made clear that even if a claim is not presented to a state court, or by inference is not ruled upon, a plaintiff is not entitled to bring that claim in federal court if the claim was one that should have been brought in the state court.... If the North Carolina Supreme Court erred in not considering a claim made by Guess, that was an issue which Guess should have

---

9. Of course, if the proceedings had been concluded favorably to Edmonds, there would be no basis for a federal civil rights action.

10. This, of course, presumes a circumstance where a litigant has chosen a state forum or has been summoned to participate in state court proceedings. *Guarino,* 11 F.3d at 1161 n. 7.

addressed to the Supreme Court [of the United States] on appeal.

*Guess,* 967 F.2d at 1003.

The quoted text from *Guess,* of course, is the language of waiver, but it also bespeaks both issue and claim preclusion as a rationale of decision. In fact, because the plaintiff in *Guess* could have brought his constitutional claims in state court but did not, res judicata barred assertion of the constitutional claims in a subsequent federal action. *Guess,* 967 F.2d at 1004.[11] Thus, whether by virtue of preclusion or waiver, Edmonds has forfeited the right to present, as the basis for claims in this Court, the constitutional questions which were part and parcel of the issues pending in, or which could have been raised in, the JIRC proceedings that were underway when Edmonds chose to resign his position rather than defend against the charges he was facing.

The foreclosure of jurisdiction in the inferior federal courts over matters of the sort here at issue is especially important in perspective of the strong state interest in regulating the conduct of the state judiciary. In *Feldman,* the Supreme Court observed that the nature of the state's interest in regulating the relationship between the state judicial system and the bar provided a sound and persuasive basis for foreclosing review by lower federal courts. The Court went on to explain, " '[t]he rule [precluding review of attorney admission, discipline or debarment on original action in district courts] serves substantial policy interests arising from the historic relationship between state judicial systems and the members of their respective bars, and between the state and federal judicial systems.' " *Feldman,* 460 U.S. at 483 n. 16 (*quoting MacKay v. Nesbett,* 412 F.2d 846, 846 (9th Cir.1969)).

That state interest is even stronger where the core proceeding involves the discipline of state judges by a mechanism and process established by the constitution and statutes of a sovereign state. As was observed in *Maurice v. Board of Directors,* 450 F.Supp. 755, 760 (E.D.Va.1977):

Discipline of a State judge is a matter of great State concern, touching as it does the very essence of State sovereignty. The proper forum for federal review of those proceedings is the United States Supreme Court on appeal or by writ of certiorari ....

*See also Feldman,* 460 U.S. at 483 n. 16 (*citing Goldfarb v. Virginia State Bar,* 421 U.S. 773, 792, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) (" 'the interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice' ")).

Edmonds' failure to seek relief in the available process by short-circuiting the state disciplinary proceedings does not confer upon this Court subject matter jurisdiction over claims which Edmonds should have presented to the JIRC, to the Supreme Court of Virginia, and, subsequently, to the Supreme Court of the United States which is empowered to review constitutional questions presented in, or inextricably intertwined with, state disciplinary proceedings of this sort. Entertainment of these claims by this Court would undermine the authority of the JIRC, and consequently, the Supreme Court of Virginia, to discipline state judges because upon the institution of proceedings in the JIRC, a state judge would, as did Edmonds in this case, voluntarily resign and then attack this "forced" resignation in the federal court system. This would deprive the state of the opportunity to fully investigate and review disciplinary matters pursuant to the Virginia Constitution and state statutes. That, of course, would stand the constitutional concept of federalism on its head by depriving state courts of a critical role in conducting a core function of state government. The only constitutionally permissible federal judicial intervention in that activity is by the Supreme Court of the United States.

---

11. It has been said that the *Rooker–Feldman* is founded, in part, in considerations of issue preclusion. Thus, it is not unusual that res judicata often is given as an alternative holding where the rationale for decision is the *Rooker–Feldman* doctrine. Gary Thompson, Note, The Rooker–Feldman Doctrine and the Subject Matter Jurisdiction of Federal District Courts, 42 Rutgers L.Rev. 859, 903 (1990).

For the foregoing reasons, the motion to dismiss Counts I, II, III, IV, and VII for lack of subject matter jurisdiction is granted.

### B. Jurisdiction over Other Claims

As noted previously, the Complaint also contains counts against the defendants for defamation, intentional infliction of emotional distress, and business conspiracy, all of which are based solely on Virginia law. Under 28 U.S.C. § 1367, in any civil action of which the district court has original jurisdiction, the court shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III.

In exercising supplemental jurisdiction over related state law claims, however, the federal claim must first have substance sufficient to confer subject matter jurisdiction on the district court. 28 U.S.C. § 1367; *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Because the Court lacks original jurisdiction over the federal claims by virtue of the *Rooker–Feldman* doctrine, it does not have supplemental jurisdiction over the remaining state law claims. Thus, Counts V, VI, and VIII of the Complaint are dismissed without prejudice.

### C. Conclusion

For the reasons set forth in this Memorandum Opinion, the Defendants' Motions to Dismiss Counts I, II, III, IV and VII are GRANTED, and they are dismissed with prejudice. Counts V, VI and VIII are dismissed without prejudice.

It is so ORDERED.